*County Council of Prince George's County v. Zimmer Development Company*, No. 64, September Term, 2014

**ZONING AND LAND USE – REGIONAL DISTRICT ACT – DISTRICT COUNCIL REVIEW OF PLANNING BOARD DECISION – SUBSTANTIAL EVIDENCE**

The County Council of Prince George's County, sitting as the District Council as a zoning body under the Regional District Act, exercises appellate jurisdiction when reviewing the action of the county Planning Board to approve or deny a comprehensive design plan or specific design plan of a property zoned previously to a comprehensive design zone (a floating zone). The Council may only reverse the action of the Planning Board if the Planning Board's decision is not supported by substantial evidence, is arbitrary and capricious, or is predicated on an error of law.

**ZONING AND LAND USE – REGIONAL DISTRICT ACT – DISTRICT COUNCIL REVIEW OF PLANNING BOARD DECISION – LIMITED TO ISSUES ON REMAND**

If the County Council of Prince George's Council, sitting as District Council, remands such a case to the Planning Board to consider or reconsider select issues, pursuant to Prince George's County Code § 27-523(a), and reviews after remand the modified decision of the Planning Board, it may reverse the modified decision of the Planning Board based only on the issues that were remanded for consideration or reconsideration.

**ADMINISTRATIVE LAW – JUDICIAL REVIEW OF DISTRICT COUNCIL DECISION – REVERSAL OF AGENCY DECISION**

A reviewing court may reverse the decision of an administrative agency, and need not remand the case for further consideration by the agency, when there remains no administrative discretion or function for the agency to exercise or perform properly and the outcome is required by law.

Circuit Court for Prince George's County
Case Nos. CAL 12-19612 & CAL 12-19613
Argued: 3 March 2015

IN THE COURT OF APPEALS OF
MARYLAND

No. 64

September Term, 2014

COUNTY COUNCIL OF PRINCE
GEORGE'S COUNTY, SITTING AS
THE DISTRICT COUNCIL

v.

ZIMMER DEVELOPMENT
COMPANY

Barbera, C.J.,
*Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,
                JJ.

Opinion by Harrell, J.

Filed: August 20, 2015

*Harrell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

Given the battle of almost epic proportions waged by the respective angels in the present litigation, it seems fitting to describe metaphorically with select readings from the entirely fictional Book of Land Use the forced march this case has made:

> Chapter MMIV (2004):
>
> > In the beginning, a landowner applied to reclassify to a floating zone a certain property in Adelphi, in the county of Prince George's, in the State of Maryland. The District Hegemon looked upon the application and saw that it was good.
>
> Chapters MMX – MMXII (2010-2012)
>
> > Time passed. The landowner sought at last approval to complete that which had been initiated lo' those many years ago. Although the landowner's latest initiatives were deemed acceptable by the County planning satraps, the District Hegemon, being displeased with these offerings, spurned them as unworthy.
> >
> > The landowner, feeling much afflicted, brought its plight before a local Sanhedrin who, finding uncharitable the District Hegemon's most recent treatment of the landowner's offerings, decreed that the offerings were pleasing indeed unto the eyes of the law.
>
> Chapter MMXV (2015)
>
> > The displeased District Hegemon brings its case now before the Great Sanhedrin, which, having heard the piteous wailing and cries from all concerned, shall now pass final judgment.

## I. THE RELEVANT LAND USE REGIME IN PRINCE GEORGE'S COUNTY: A MIND-NUMBING PRIMER

Most judges and lawyers, and many public officials and members of the general public, are uninitiated (and perhaps even uninterested, unless their oxen are being gored) in the mysteries of land use regulation. With apologies particularly to the uninterested,

the following introduction to the relevant zoning, planning, and land use regime in play virtually throughout all of Prince George's County (and the Regional District of which it is a part) is useful, if not essential, in order to grasp the context of the facts of this case and our decision to follow. Because the dispute is primarily about the source and terms of the locality's authority to regulate land use, we will explore first the well-spring of that authority.

The modern authority to regulate land use in Maryland may be traced to the colonial Maryland Charter of 1632. The Charter granted to the Lord Proprietor "free, full, and absolute power . . . to ordain, make, enact, and . . . publish any laws whatsoever . . . ."[1,2] Maryland Charter of 1632 (modified for modern spelling). Much of

---

[1] The Charter required any legislative action to "be consonant to Reason, and be not repugnant or contrary, but (so far as conveniently may be) agreeable to the Laws, Statutes, Customs and Rights of this Our Kingdom of England." The laws of England at the time did not limit the regulation of private land for the public good. John F. Hart, *Colonial Land Use Law and Its Significance for Modern Takings Doctrine*, 109 Harv. L. Rev. 1252, 1285-86 (1996); see Charles II, 1666: An Act for rebuilding the Citty of London, reprinted in 5 *Statutes of the Realm* 1628-80, at 603-612 (John Raithby ed., 1819), http://www.british-history.ac.uk/statutes-realm/vol5/pp603-612 (establishing a building code to regulate construction of new dwellings in the aftermath of the Great Fire of London).

In modern times, this broad authority is referred to as the State's "police power." "In its broadest sense the police power is said to be the power of government inherent in every sovereignty." *Tighe v. Osborne*, 149 Md. 349, 356, 131 A. 801, 803 (1925); *see also Lawton v. Steele*, 152 U.S. 133, (1894). Like the language of its primordial grant, such power is not absolute. As we have noted,

> [i]n this state the courts have uniformly held that the police power is not unlimited, but that wherever it is invoked in aid of any purpose or legislation, such purpose or legislation must bear some definite and tangible relation to the health,

(Continued…)

this authority was wrested from the Proprietor by the legislative assembly prior to the colony achieving independence from Great Britain. *See generally* Albert J. Martinez, Jr., *The Palatinate Clause of the Maryland Charter, 1632-1776: From Independent Jurisdiction to Independence*, 50 Am. J. Legal Hist. 305 (2008-2010). The State of Maryland retains this broad authority to regulate land use (and to delegate powers to the political subdivisions), subject only to the Federal and State constitutions.

---

(…continued)

> comfort, morals, welfare, or safety of the public, which must define the farthest boundaries of its territory.

*Goldman v. Crowther*, 147 Md. 282, 293, 128 A. 50, 54 (1925).

[2] The colonial administration exercised its land use power. Maryland's mill act, stating that most of the places fit for building watermills was owned by people who, on account of being underage or "willfully obstinate," would not sell their property to those willing to construct mills, established a process by which an individual proposing to build a mill could condemn another's property. Hart, *Colonial Land Use Law and Its Significance for Modern Takings Doctrine*, *supra*, at 1267 (1996) (quoting Act of May 8, 1669, 2 *Archives of Maryland* 211, 211-12 (William H. Browne ed., 1884)). One of the apparent purposes of the statute was to diversify the agricultural output of the colony by encouraging farmers to grow grains, rather than only tobacco. John F. Hart, *The Maryland Mill Act, 1669-1766: Economic Policy and the Confiscatory Redistribution of Private Property*, 39 Am. J. Legal Hist. 1, 7-11 (1995); *see also* Act of May 8, 1669, 2 *Archives of Maryland* 211 (William H. Browne ed., 1884) (stating in the preamble that "husbandry in tilling the ground for and sowing of wheat and Barly is but coldly prosecuted though the Advantages thereby in rayseing the stock of Neate Cattle be great"). Other examples of exercise of land use power include a scheme aimed at encouraging the construction of forges and foundries, Hart, *Colonial Land Use Law and Its Significance for Modern Takings Doctrine*, *supra* at 1267 (citing Act of 1719, para. II, 33 *Archives of Maryland* 467, 467-68 (Clayton C. Hall ed., 1913)), and the prohibition of the construction of dams that damaged fisheries or impeded navigation, Acts of June 15, 1768, Nos. 4 & 5, 61 Archives of Maryland 427 (J. Hall Pleasants ed., 1944).

## A. Delegation of Land Use Powers to Local Governments.

Maryland, like its sister states, delegates to local political subdivisions significant authority to regulate land use.[3] 1 Edward H. Ziegler, Jr*., Rathkopf's The Law of Zoning and Planning* §§ 1:9, 36:2 (4th ed. 2015) [hereinafter *Rathkopf's The Law of Zoning and Planning*]; *see also Mayor & Council of Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, 528, 814 A.2d 469, 476 (2002). Local governments possess no inherent power to regulate land use, but rather are limited to the powers granted to them by the State. *W. Montgomery Cnty. Citizens Ass'n v. Maryland-Nat'l Capital Park & Planning Comm'n*, 309 Md. 183, 186, 522 A.2d 1328, 1329 (1987) (citing *Crozier v. Co. Comm. Pr. George's Co.*, 202 Md. 501, 505-07, 97 A.2d 296 (1953); *see also Reynolds v. Sims*, 377 U.S. 533, 575 (1964) ("Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions"). *But cf.* William J. Novak, *The People's Welfare: Law and Regulation in Nineteenth Century America* 171-189 (discussing the objections of Eighteenth Century jurists to state-wide regulation of liquor, while the same jurists had upheld identical local liquor controls without serious scrutiny).

---

[3] The State exercises concurrently limited planning authority. The State Department of Planning and its Secretary prepare plans "to promote the general welfare and prosperity of the people of the State" by considering "studies of governmental, economic, physical, and social conditions and trends." Maryland Code (2001, 2009 Repl. Vol.), State Finance and Procurement Article, § 5-602 ("SFP"); *see also* SFP §§ 5-309, 5-203.

Under Maryland's constitutional scheme, a local government's authority to regulate land use may emanate only from enabling legislation of the General Assembly. *See* Maryland Const. Art. XI; *W. Montgomery Cnty. Citizens Ass'n*, 309 Md. at 186, 522 A.2d at 1329 (citing *Crozier*, 202 Md. at 505-07, 97 A.2d 296). These powers are exercised, "in the main, through the implementation of what is known as the planning and zoning process." *Rylyns Enterprises*, 372 Md. at 531-32, 814 A.2d at 479.

## B. Zoning and Planning Distinguished

Although related concepts, it is well established in Maryland that zoning and planning are separate functions. *Appleton Reg'l Cmty. Alliance v. Cnty. Comm'rs of Cecil Cnty.*, 404 Md. 92, 102, 945 A.2d 648, 653 (2008); *Mueller v. People's Counsel for Baltimore Cnty.*, 177 Md. App. 43, 68, 934 A.2d 974, 989 (2007) (citing *Howard Co. v. Dorsey*, 292 Md. 351, 361, 438 A.2d 1339 (1982); *Board of Cnty. Comm'rs of Carroll County v. Stephans*, 286 Md. 384, 389, 408 A.2d 1017 (1979)). Maryland courts have parsed previously the distinction.

Zoning is the more finite term. *Rylyns Enterprises*, 372 Md. at 528-29, 814 A.2d at 476-77. Generally, "the term 'zoning' is 'used to describe the process of setting aside disconnected tracts of land varying in shape and dimensions, and dedicating them to particular uses designed in some degree to serve the interests of the whole territory affected by the plan.'" *Maryland Overpak Corp. v. Mayor and City Council of Baltimore*, 395 Md. 16, 48, 909 A.2d 235, 254 (2006) (quoting *Stephans*, 286 Md. at 388-89, 408 A.2d at 1019). The "territorial division of land within a jurisdiction" is "[t]he very essence of zoning . . . ." *Mueller*, 177 Md. App. at 67-68, 934 A.2d at 988 (citing *Heath*

*v. Mayor and City Council of Baltimore*, 187 Md. 296, 305, 49 A.2d 799 (1946)). Parcels must be put to use in compliance with their zoning, excepting legal non-conforming uses.[4]

Planning is the broader term. *Bd. of Cnty. Comm'rs of Cecil Cnty. v. Gaster*, 285 Md. 233, 246, 401 A.2d 666, 672 (1979); *Mueller*, 177 Md. App. at 69, 934 A.2d at 989; *see also Rylyns Enterprises*, 372 Md. at 529, 814 A.2d at 477-78 (stating that zoning is the more finite term). Planning concerns "the development of a community, not only with respect to the uses of lands and buildings, but also with respect to streets, parks, civic beauty, industrial and commercial undertakings, residential developments and such other matters affecting the public convenience . . . ." *Gaster*, 285 Md. at 246, 401 A.2d at 672 (quoting 1 E. C. Yokley, *Zoning Law and Practice* § 1-2 (4th ed. 1978)). Unsurprisingly, the making of "plans" falls clearly under the ambit of "planning." *See Rylyns Enterprises*, 372 Md. at 529, 814 A.2d at 477.

Included in the zoning or planning powers is also the authority to enforce zoning and planning actions and decisions. For example, Maryland courts recognize the requirement and issuance of building and occupancy permits as part of the zoning power, *Joy v. Anne Arundel Cnty.*, 52 Md. App. 653, 657-68, 451 A.2d 1237, 1240 (1982), and subdivision controls as an element of the exercise of the planning power, *Richmarr Holly Hills, Inc. v. Am. PCS, L.P.*, 117 Md. App. 607, 645-46, 701 A.2d 879, 898 (1997). Just as the power to zone implies more than establishing classifications and placing them on

---

[4] We describe non-conforming uses *infra* at note 16.

6

an official map, so too does the planning power encompass more than merely producing plans and acting on subdivision applications. Because "planning and zoning complement each other and serve certain common objectives,"[5] *People's Counsel for Baltimore Cnty. v. Surina*, 400 Md. 662, 689, 929 A.2d 899, 915 (2007); *accord Richmarr*, 117 Md. App. at 650, 701 A.2d at 900 (quoting 4 R. Anderson, *American Law of Zoning* § 23.20 (2nd ed. 1977)), some implementation and enforcement procedures may have both planning and zoning aims.[6]

## C. Zoning in General

Maryland's first local zoning enabling statute was enacted by the General Assembly in 1927 authorizing zoning in Baltimore City and other municipalities with

---

[5] The zoning and planning, when implemented together, aim to guide growth

> in a manner that allows for the expansion of economic activities and opportunities in the area or region for the benefit of its residents, while at the same time attempting to maintain the quality of life of the region, all without unduly disturbing the reasonable expectations of the citizenry as to the permissible uses they may make of real property.

*Mayor & Council of Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, 532, 814 A.2d 469, 479 (2002); *see also* Maryland Code (2012), Land Use Article, §§ 4-202, 10-302 ("LU") (requiring certain objectives for zoning regulations and, in Baltimore City, requiring such zoning regulations to be "in accordance with the plan").

[6] For example, implementation of subdivision controls, an element of the planning power, must comply as well with applicable zoning regulations. *People's Counsel for Baltimore Cnty. v. Surina*, 400 Md. 662, 691-92, 929 A.2d 899, 916 (2007); *see also, e.g.*, Prince George's County Code § 24-121(a) ("PGCC") ("The Planning Board shall require that proposed subdivisions . . . [are] platted in conformance with all of the requirements of the Zoning Ordinance applicable to the subject property.").

more than 10,000 inhabitants.[7] *See* 1927 Md. Laws ch. 705. In reliance on this delegation, Baltimore City enacted its first comprehensive zoning ordinance on 30 March 1931.[8] *See Jack Lewis, Inc. v. Mayor & City Council of Baltimore*, 164 Md. 146, 148, 164 A. 220, 221 (1933). Since then, counties (both charter and otherwise) have been delegated also zoning powers. *See* Maryland Code (2012), Land Use Article §§ 4-102, 22-104 ("LU").

### 1. Original and Comprehensive Zoning Versus Piecemeal Zoning

Local zoning authorities implement their delegated zoning authority through "establishment of original zoning through adoption of a [an original] zoning map, comprehensive rezoning of substantial areas of the jurisdiction through a legislative-type process initiated by the local government, and piecemeal rezoning of individual properties (by application of the owner or contract purchaser) through a quasi-judicial

---

[7] That same year, the precursor to the Maryland-Washington Regional District Act (more on this later) was enacted by the Legislature. *See* 1927 Md. Laws ch. 448; *see also infra* note 29. At that time, however, primary zoning authority was not delegated to the local governments in the Regional District, but rather rested with the Maryland-National Capital Park & Planning Commission. 1927 Md. Laws ch. 448, § 23.

[8] Baltimore City enacted previously a precursor ordinance that required a permit from a "zoning commissioner" to erect any structure or change the use of land or structures. *Tighe*, 149 Md. at 353, 131 A. at 802. The zoning commissioner was authorized to refuse issuance of the permit for any non-residential construction or use if, "in his judgment after investigation, the proposed buildings or structures, use, or changes of use would create hazards from fire or disease, or would in any way menace the public welfare, security, health or morals." *Tighe*, 149 Md. at 353, 131 A. at 802. We held this regulation invalid because allowing denial of a permit justified only by "public welfare" considerations "delegate[d] to the zoning commissioner and the board of zoning appeals of Baltimore city arbitrary, undefined, and unreasonable powers." *Tighe*, 149 Md. at 368, 131 A. at 808. In a later dispute between the same parties, we held the revised ordinance, which did not authorize denial of the permit based on "public welfare" considerations, to be a valid delegation of the police power. *Tighe v. Osborne*, 150 Md. 452, 459-60 133 A. 465, 467-68 (1926).

process." *Anne Arundel Cnty. v. Bell*, 442 Md. 539, 553, 113 A.3d 639, 647 (2015) (citing *Rylyns Enterprises*, 372 Md. at 532, 814 A.2d at 479). Original zoning and, by definition, comprehensive rezoning involve large geographic areas and emanate largely from policy considerations, including future public needs, potential for orderly growth, and the public health, safety, and general welfare to be advanced.[9] *Bell*, 442 Md. at 553-54, 113 A.3d at 647-48 (citing *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 713, 376 A.2d 483, 498 (1977)). Piecemeal rezonings, in contrast, concern an individual property (or a relatively finite assemblage of properties) that is rezoned through a deliberative fact-finding process, including "at least one evidentiary hearing (generally), factual and opinion testimony, documentary evidence, cross-examination of the witnesses, and objections to the weighing of evidence." *Bell*, 442 Md. at 555, 113 A.3d at 649 (citing *Anderson House, LLC v. Mayor of Rockville*, 402 Md. 689, 708 n.17, 939 A.2d 116, 127 n.17 (2008)). The piecemeal rezoning "process results in a particularized set of written findings of fact and conclusions of law as to the zoning proposal for the parcel or assemblage in question." *Id*. Both processes conclude with a

_____

[9] In *Rylyns Enterprises*, we stated that for a legislative act of zoning to qualify as a "proper" comprehensive rezoning it must:

> 1) cover a substantial area; 2) be the product of careful study and consideration; 3) control and direct the use of land and development according to present and planned future conditions, consistent with the public interest; and, 4) set forth and regulate all permitted land uses in all or substantially all of a given political subdivision, though it need not zone or rezone all of the land in the jurisdiction.

372 Md. at 535, 814 A.2d at 481.

9

legislative act creating or altering the official zoning map for the jurisdiction. *Anderson House*, 402 Md. at 707 n.17, 939 A.2d at 127 n.17.

The scope of review by Maryland courts of the legislative decisions embodied in original zonings and comprehensive rezonings is quite narrow.[10] These actions "'are limited only by the general boundaries of appropriate procedural and due process considerations.'" *Bell*, 442 Md. at 554, 113 A.3d at 648 (quoting *Rylyns Enterprises*, 372 Md. at 533, 814 A.2d at 480.) Courts look to whether the local zoning authority: (1) followed the appropriate procedure designated by the zoning enabling statute and its own ordinances; (2) comported with the requirements of due process; (3) aimed to achieve a valid public purpose; and, (4) did not otherwise exceed the police powers.[11] *See Rylyns*

---

[10] We described recently in *Anne Arundel County v. Bell*, 442 Md. 539, 113 A.3d 639 (2015), the standing requirements a plaintiff must meet to challenge a comprehensive rezoning. *See generally* 442 Md. at 554-85, 113 A.3d at 649-67. A plaintiff must demonstrate that he, she, or it is eligible under taxpayer standing by "alleg[ing] two things: (1) that the complainant is a taxpayer and (2) that the suit is brought, either expressly or implicitly, on behalf of all other taxpayers." *Bell*, 442 Md. at 577, 113 A.3d at 662 (quoting *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 547, 92 A.3d 400, 457 (2014)). "Once a complainant establishes eligibility to bring a suit, he, she, or it must allege, as noted above, both a governmental action that is illegal or *ultra vires* and that the action may affect injuriously the taxpayer's property (meaning that it reasonably may result in a pecuniary loss to the taxpayer or an increase in taxes)." *Bell*, 442 Md. at 578, 113 A.3d at 662 (citing *State Center*, 438 Md. at 540, 92 A.3d at 453). The harm alleged must be particularized and pecuniary, as opposed to harms to the general public (e.g., changes to the neighborhood, increased traffic, or increased noise), and caused potentially by the comprehensive rezoning. *Bell*, 442 Md. at 578-79, 585, 113 A.3d at 662-63, 667.

[11] Original zonings and comprehensive rezonings are subject to judicial invalidation when found to be arbitrary, discriminatory or illegal. *See Anderson House, LLC v. Mayor & City Council of Rockville*, 402 Md. 689, 720, 939 A.2d 116, 134-34 (2008); *Ark Readi-Mix Concrete Corp. v. Smith*, 251 Md. 1, 4, 246 A.2d 220, 221 (1968).

(Continued…)

10

*Enterprises,* 372 Md. at 533, 814 A.2d at 480 (quoting *White v. Spring,* 109 Md. App.

692, 696–97, 675 A.2d 1023, 1025 (1996)). Properly enacted original zoning and

comprehensive rezoning are presumed to be correct and may only be changed by the

local zoning authority through later comprehensive zoning or an application for

piecemeal rezoning. *Bell*, 442 Md. at 554, 554 n.6, 113 A.3d at 648, 648 n.6 (quoting

*Rylyns Enterprises*, 372 Md. at 535–36, 814 A.2d at 481).

Courts are somewhat less deferential in their review of quasi-judicial piecemeal

rezoning.[12] Like other quasi-judicial decisions, piecemeal rezoning is reviewed most

frequently under the substantial evidence test. *Cremins v. Cnty. Comm'rs of Washington*

---

(…continued)
When an original zoning or comprehensive zoning is "the product of careful study and consideration" and "control[s] and direct[s] the use of land and development according to present and planned future conditions, consistent with the public interest[,]" however, its legislative determinations will not be disturbed. *See Bell*, 442 Md. at 554, 113 A.3d at 648 (quoting *Rylyns Enterprises*, 372 Md. at 535, 814 A.2d at 481).

[12] We summarized also in *Bell* the requirements for property owner standing that applies typically to piecemeal rezonings and other administrative land use decisions or executive actions. To establish property owner standing, a complainant must be "specially aggrieved." *See Bell*, 442 Md. at 558, 113 A.3d at 651. The most important consideration in whether a property owner is specially aggrieved is the presumption derived from the proximity of his/her/its property to the rezoned property. *Bell*, 442 Md. at 558, 113 A.3d at 650 (citing *Ray v. Mayor & City Council of Baltimore*, 430 Md. 74, 82, 59 A.3d 545, 550 (2013)). Our cases demonstrate that a party will only be specially aggrieved for purposes of property owner standing if the party is "an adjoining, confronting, or nearby property owner" (*prima facie* aggrieved) or is "farther away than an adjoining, confronting, or nearby property owner, but is still close enough to the site of the rezoning action and offers 'plus factors' supporting injury" (almost *prima facie* aggrieved). *Bell*, 442 Md. at 559, 113 A.3d at 651 (quoting *Ray*, 430 Md. at 91, 59 A.3d at 551-52). We have found almost *prima facie* aggrieved complainants whose property is between 200 and 1000 feet away from the subject property. *Id.* (citing *Ray*, 430 Md. at 91, 59 A.3d at 555).

11

*Cnty.*, 164 Md. App. 426, 438, 883 A.2d 966, 973 (2005). The determination of the zoning authority should be upheld "if reasoning minds could reasonably reach the conclusion from facts in the record." *Cremins*, 164 Md. App. at 438, 883 A.2d at 973 (citing *Stansbury v. Jones*, 372 Md. 172, 182-83, 812 A.2d 312, 318 (2002)).

### 2. Euclidian Zones

Early zoning ordinances sought to separate incompatible land uses through a method that would become known as "Euclidean" zoning.[13] 1 *Rathkopf's The Law of Zoning and Planning* § 1:4. Under a Euclidian zoning scheme, a zoning authority divides geographically an area into use districts. *Rylyns Enterprises*, 372 Md. at 534, 814 A.2d at 480 (quoting *Rouse–Fairwood Dev. Ltd. P'ship v. Supervisor of Assessments for Prince George's County*, 138 Md. App. 589, 623, 773 A.2d 535, 555 (2001)). Certain permitted uses are specified by local ordinance and allowed in particular geographic areas. *Id.* (citing *Rouse–Fairwood Dev.*, 138 Md. App. at 623, 773 A.2d at 555). These geographic areas and the zoning assigned to them are then recorded on an official zoning map. *Id.* (citing *Rouse–Fairwood Dev.*, 138 Md. App. at 623, 773 A.2d at 555). The number of classifications that are available to be applied within a district has increased exponentially since the early schemes, but Euclidian zoning remains a basic framework for implementation of land use controls at the local level. 1 *Rathkopf's The Law of Zoning and Planning* §§ 1:4, 1:5; *see also, e.g,* Prince George's County Code § 27-109

---

[13] Euclidian zoning owes its name to *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365 (1926). In *Euclid*, the U.S. Supreme Court held that a zoning scheme that excluded apartments and commercial uses from a single-family residential district was constitutional. 272 U.S. at 396-97.

("PGCC") (listing the categories of zones that have been created in Prince George's County).

Euclidian zoning aimed to provide stability and predictability in land use planning and zoning. *Rylyns Enterprises*, 372 Md. at 534, 814 A.2d at 481. The legislative enactment of a Euclidian original zoning or comprehensive rezoning is self-executing, *id.*, and discretionary consideration of individual proposed uses is the exception rather than the rule, 1 *Rathkopf's The Law of Zoning and Planning* § 1:4. Euclidian zoning laws in Maryland must "be uniform for each class or kind of development throughout a district or zone[,]" LU §§ 4-201(b)(2)(i), 10-301(b)(2)(i); 22-201(b)(2)(i), to ensure that similarly situated properties are subjected to similar regulation,[14] *see Anderson House*, 402 Md. at 713-14, 939 A.2d at 131. The original or comprehensive zoning may be changed (unless by a subsequent comprehensive zoning) only by a subsequent piecemeal zoning, which in the case of a Euclidean zone may be granted only upon a showing of unforeseen changes in the surrounding neighborhood occurring since the prior original zoning or comprehensive rezoning or mistake of fact made by the zoning authority in the original

---

[14] This requirement is referred to commonly as the "uniformity requirement" of Euclidean zoning. *Anderson House*, 402 Md. at 713, 939 A.2d at 130. It originated from the Standard State Zoning Enabling Act, which "was written during the 1920s by 'the distinguished original group of planning lawyers in this country[,]' Edward Bassett, Frank Williams, and Alfred Bettman with the advocacy of Herbert Hoover's Department of Commerce." *Anderson House*, 402 Md. at 713, 939 A.2d at 130 (alteration in original) (quoting Norman Williams, Jr. & John M. Taylor, *American Land Planning Law* § 18.01, at 461 (3rd ed. 2003)). Although the uniformity requirement arises from policy decisions to prevent arbitrary zoning classifications, and may not be a legal necessity, it has been adopted in the zoning enabling acts of nearly every state. *Anderson House*, 402 Md. at 713, 939 A.2d at 131.

zoning or previous comprehensive rezoning.[15] *Rylyns Enterprises*, 372 Md. at 538, 814

A.2d at 483 (citing *Stratakis v. Beauchamp*, 268 Md. 643, 652-53, 304 A.2d 244, 249

(1973); *Richmarr*, 117 Md. App. at 635-37, 701 A.2d at 893-94).

A school of thought evolved that the stability and predictability of Euclidian

zoning amounted sometimes to undesirable rigidity. *See People's Counsel for Baltimore*

---

[15] This requirement is known as the "change-mistake rule." *Rylyns Enterprises*, 372 Md. at 538, 814 A.2d at 483. As described in *Rylyns Enterprises*:

> The "change-mistake" rule is a rule of the either /or type. The "change" half of the "change-mistake" rule requires that, in order for a piecemeal Euclidean zoning change to be approved, there must be a satisfactory showing that there has been significant and unanticipated change in a relatively well-defined area (the "neighborhood") surrounding the property in question since its original or last comprehensive rezoning, whichever occurred most recently. The "mistake" option of the rule requires a showing that the underlying assumptions or premises relied upon by the legislative body during the immediately preceding original or comprehensive rezoning were incorrect. In other words, there must be a showing of a mistake of fact. Mistake in this context does not refer to a mistake in judgment. Additionally, even where evidence of a change or mistake is adduced, there is no reciprocal right to a change in zoning, nor is there a threshold evidentiary standard which when met compels rezoning. Even with very strong evidence of change or mistake, piecemeal zoning may be granted, but is not required to be granted, except where a failure to do so would deprive the owner of all economically viable use of the property. In Maryland, the change-mistake rule applies to all piecemeal zoning applications involving Euclidian zones, including those involving conditional zoning. The change-mistake rule does not apply, in any event, to changes in zoning made in a comprehensive rezoning, or the piecemeal grant of a floating zone.

372 Md. at 538-39, 814 A.2d at 483 (citations omitted) (footnotes omitted).

*Cnty. v. Loyola Coll. in Maryland*, 406 Md. 54, 71-72, 956 A.2d 166, 176 (2008); *Rylyns*

*Enterprises*, 372 Md. at 541, 814 A.2d at 485; 1 *Rathkopf's The Law of Zoning and*

*Planning* § 1:4. Although certain land use tools that fall under the zoning umbrella, such

as non-conforming uses,[16] special exceptions,[17] and variances,[18] give Euclidian zoning

---

[16] We summarized Maryland's non-conforming uses jurisprudence in *Trip Associates, Inc. v. Mayor & City Council of Baltimore*, 392 Md. 563, 898 A.2d 455 (2006). A property owner establishes a non-conforming use if the property owner can demonstrate to the relevant authority (often a local board of appeals) that the property was being used in a then-lawful manner before, and at the time of, the adoption of a new zoning ordinance which purports to prohibit the use on the property. *Trip Associates*, 392 Md. at 573, 898 A.2d at 455. Such a property owner has a vested constitutional right to continue the prohibited use, subject to local ordinances that may prohibit "extension" of the use and seek to reduce the use to conformance with the newer zoning through an "amortization" or "abandonment" scheme. *See Trip Associates*, 392 Md. at 574-75, 580, 898 A.2d at 455-56, 459. Nevertheless, nonconforming uses are not favored by Maryland law, and local ordinances regulating validly non-conforming uses will be construed to effectuate their purpose. *Trip Associates*, 392 Md. at 573, 898 A.2d at 455-56 (quoting *Cnty. Council of Prince George's Cnty. v. E. L. Gardner, Inc.*, 293 Md. 259, 268, 443 A.2d 114, 119 (1982)).

[17] A special exception, sometimes called a "conditional use," is a zoning device that provides a middle ground between permitted and prohibited uses. *People's Counsel for Baltimore Cnty. v. Loyola Coll. in Maryland*, 406 Md. 54, 71, 71 n.19, 956 A.2d 166, 176, 176 n.19 (2008); *cf. Maryland Overpak Corp. v. Mayor And City Council Of Baltimore*, 395 Md. 16, 29, 909 A.2d 235, 243 (2006) (citing *Lucas v. People's Counsel for Baltimore County*, 147 Md. App. 209, 227 n.20, 807 A.2d 1176, 1186 n.20 (2002)) (noting that there may be a "highly-nuanced distinction" between conditional uses and special exceptions, but describing them together). It allows the local legislature to set some uses as *prima facie* compatible for a given zone, subject to a case-by-case evaluation to determine whether the use would result in an adverse effect on the neighborhood (other than any adverse effect inherent in that use within the zone), such that would make the use actually incompatible. *Loyola Coll.*, 406 Md. at 71-72, 106, 956 A.2d at 176, 197-98. Because special exceptions are created legislatively, they are presumed to be correct and an appropriate exercise of the police power. *Rylyns Enterprises*, 372 Md. at 543, 814 A.2d at 486 (citing *Brandywine Enterprises, Inc. v. Prince George's County Council*, 117 Md. App. 525, 700 A.2d 1216 (1997)).

some flexibility, they were thought not to be enough.[19] *Rylyns Enterprises*, 372 Md. at 537, 814 A.2d at 482 (quoting Stanley D. Abrams, *Guide to Maryland Zoning Decisions*, § 11.1 (3d ed., Michie 1992)).

---

(…continued)

[18] "A variance refers to administrative relief which may be granted from the strict application of a particular development limitation in the zoning ordinance (i.e., setback, area and height limitations, etc.)." *Rylyns Enterprises*, 372 Md. at 537, 814 A.2d at 482 (quoting Stanley D. Abrams, *Guide to Maryland Zoning Decisions*, § 11.1 (3d ed., Michie 1992)). The Land Use Article defines "variance" as

> a modification only of density, bulk, dimensional, or area requirements in the zoning law that is not contrary to the public interest, and where, owing to conditions peculiar to the property and not because of any action taken by the applicant, a literal enforcement of the zoning law would result in unnecessary hardship or practical difficulty, as specified in the zoning law.

LU § 1-101(s). Local zoning authorities (be it boards of appeal, zoning hearing examiner, or local legislature, depending on how this authority is delegated and/or re-delegated) determine somewhat the considerations by which variance requests are decided, including whether the "unnecessary hardship" or "practical difficulties" standard applies. *See Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355 Md. 259, 266-67, 734 A.2d 227, 231-32 (1999) (holding that Anne Arundel County, through a County ordinance, required property owners seeking a variance in the Chesapeake Critical Area to demonstrate unwarranted hardship, a more exacting standard, as opposed to practical difficulties, which was required previously); *see also Belvoir Farms Homeowners Ass'n*, 355 Md. 266 n.4, 734 A.2d 331 n.4 (noting a possible change by the ordinance to the "traditional uniqueness standard" by which applicable unnecessary hardship or practical difficulties must be caused). The property owner must prove generally that a variance is warranted, *Mueller v. People's Counsel for Baltimore Cnty.*, 177 Md. App. 43, 70, 934 A.2d 974, 989 (2007) (citing *Easter v. Mayor and City Council of Baltimore*, 195 Md. 395, 400, 73 A.2d 491 (1950)).

[19] These land use tools may be employed also in so-called "floating" zones. *See Loyola Coll.*, 406 Md. at 72 n.20, 956 A.2d at 176 n.20. We discuss floating zones *infra* at Part I.C.3.

### 3. Floating Zones

Floating zones (or planned unit development zones) are a local legislative response to the relative rigidity of Euclidian zoning and occupy the opposite end of the flexibility continuum of zoning categories from Euclidian zones.[20] *Rylyns Enterprises*, 372 Md. at 539 n.15, 814 A.2d at 484 n.15. Rezoning a parcel to a floating zone resembles in some aspects a special exception process, s*ee id.* (citing *Richmarr*, 117 Md. App. at 640, 701 A.2d at 895 (1997)); 1 *Rathkopf's The Law of Zoning and Planning* § 14:32, but, unlike a special exception, it culminates in a legislative act amending the zoning on the official zoning map.

Floating zones are used often to allow the development of specialized or mixed uses. 3 *Rathkopf's The Law of Zoning and Planning* § 45:1; *see Rylyns Enterprises*, 372 Md. at 539 n.15, 814 A.2d at 484 n.15 (citing Russell R. Reno, *Non Euclidean Zoning: the Use of the Floating Zone*, 23 Md. L. Rev. 105, 107 (1963)). "In particular, floating zones have been used to permit large commercial and industrial uses, mixed uses, multifamily residences, and planned unit developments." 3 *Rathkopf's The Law of Zoning and Planning* § 45:1.

Local zoning authorities implement, where appropriate, floating zones through a two-step process. 1 Patricia E. Salkin, *American Law of Zoning* § 9:17 (5th ed. 2009) [hereinafter *Am. Law Zoning*]. First, the local zoning authority establishes in its zoning

---

[20] A "Planned Unit Development" is a synonym substantially for a floating zone. *Rylyns Enterprises*, 372 Md. at 533 n.9, 814 A.2d at 480 n.9; *see also Bell*, 442 Md. at 557, 113 A.3d at 650.

ordinance a specific zoning classification for a specific purpose or a class of purposes, but does not assign on the zoning map the classification to any property, awaiting instead a property owner's piecemeal application that is judged to meet the legislative criteria for the zone sought. 1 *Am. Law Zoning* § 9:17. This zone is said thus to "float" above the local jurisdiction to which the zone may be applied through the grant of a piecemeal zoning map amendment (or possibly through the adoption of a comprehensive rezoning, provided there was at least pending a piecemeal application at the time the comprehensive rezoning is adopted). *Bigenho v. Montgomery Cnty. Council*, 248 Md. 386, 391, 237 A.2d 53, 57 (1968); *see also Rylyns Enterprises*, 372 Md. at 539 n.15, 814 A.2d at 484 n.15 (citing Reno, *Non Euclidean Zoning: the Use of the Floating Zone*, *supra*, at 107); 1 *Am. Law Zoning* § 9:17. The second step is a property owner initiating a piecemeal rezoning action to implement the zone on a particular parcel. *Rylyns Enterprises*, 372 Md. at 539 n.15, 814 A.2d at 484 n.15 (citing Reno, *Non Euclidean Zoning: the Use of the Floating Zone, supra*, at 107); *Bigenho*, 248 Md. at 391, 237 A.2d at 56; 1 *Am. Law Zoning* § 9:17.

Although the processing, review, and grant of a floating zone follows usually the same quasi-judicial process as Euclidian piecemeal rezonings, the change-mistake rule does not apply to the former.[21] *See Bell*, 442 Md. at 555-56, 113 A.3d at 649 (citing *Rylyns Enterprises*, 372 Md. at 539, 814 A.2d at 483–84); *Aubinoe v. Lewis*, 250 Md.

---

[21] Floating zones, like special exceptions, partake of presumptive validity, provided certain conditions are met, because the zoning authority included them in its zoning ordinance. *See Huff v. Bd. of Zoning Appeals of Baltimore Cnty.*, 214 Md. 48, 62, 133 A.2d 83, 91 (1957).

645, 653, 244 A.2d 879, 884 (1968)). To rezone a property to a floating zone, the zoning authority must find generally that the legislative prerequisites for the zone are met and the rezoning is compatible with the surrounding neighborhood (much as required to grant a special exception). *See Bell*, 442 Md. at 555-56, 113 A.3d at 649 (citing *Aubinoe*, 250 Md. at 653, 244 A.2d at 884); *Rylyns Enterprises*, 372 Md. at 539 n.15, 814 A.2d at 484 n.15 (citing *Richmarr*, 117 Md. App. at 640, 701 A.2d at 895); *Bigenho*, 248 Md. at 391, 237 A.2d at 56-57. The burdens of production and persuasion to demonstrate that the rezoning is appropriate fall on the applicant for a floating zone.[22] *Rockville Crushed Stone, Inc. v. Montgomery Cnty.*, 78 Md. App. 176, 193, 552 A.2d 960, 968 (1989); 3 *Rathkopf's The Law of Zoning and Planning* § 45:4; *see also Aubinoe*, 250 Md. at 653, 244 A.2d at 884 ("It is vitally important that the District Council make appropriate express findings based on adequate evidence that the purposes set forth in the Ordinance for the [floating] zone exist and that the project is compatible with the existing uses in the general neighborhood.").

Planning considerations are normally accorded greater weight in assessing piecemeal rezoning applications for floating zones compared to those for Euclidian

---

[22] Although we have characterized floating zones and special exceptions as being analogous, *e.g.*, *Bigenho v. Montgomery Cnty. Council*, 248 Md. 386, 391, 237 A.2d 53, 56 (1968), differences exist. It may be material whether the administrative action is left to a legislative body, rather than an administrative or executive body. In *Huff*, in which we acknowledged the validity of floating zones, we adopted much of the reasoning of the landmark case regarding floating zones, *Rodgers v. Vill. of Tarrytown*, 302 N.Y. 115, 96 N.E.2d 731 (1951). We did not adopt, however, the New York court's language that a floating zone scheme that "call[s] for separate legislative authorization for each project presents no obstacle or drawback[.]" *Compare Rodgers*, 302 N.Y. at 122, 96 N.E.2d at 733, *with Huff*, 214 Md. at 63, 133 A.2d at 92.

zones, the latter of which are linked to the change/mistake rule. *See Richmarr*, 117 Md. App. at 637, 637 n.24, 701 A.2d at 894, 894 n.24. "Floating zones tend to be plan-implementation mechanisms" by which zoning decision-makers may carry out planning goals.[23] *Richmarr*, 117 Md. App. at 637, 701 A.2d at 894.

## *4. Conditional Zoning*

Another tool creating flexibility within the zoning process (whether Euclidian or floating zones are under consideration) is conditional zoning. Conditional zoning, available under the piecemeal rezoning process in Prince George's County, LU § 22-214(a), allows the placement in the grant of rezoning on the subject property of conditions regulating the specific parcel in ways other than by standards or limitations that are applicable to all land zoned similarly in the district. *Bd. of Cnty. Comm'rs of Washington Cnty. v. H. Manny Holtz, Inc.*, 65 Md. App. 574, 579, 501 A.2d 489, 491 (1985); 1 *Am. Law Zoning* § 9:20. With wise application, conditional zoning may mitigate negative effects of a use on nearby property owners while allowing land to be used as desired by its owner. 3 *Rathkopf's The Law of Zoning and Planning* § 44:2. In Maryland, local conditional zoning authority, at least for Euclidian zones,[24] must be

---

[23] That is not to say that Euclidian zoning may not be used also to implement planning considerations. *See Archers Glen Partners, Inc. v. Garner*, 176 Md. App. 292, 311, 933 A.2d 405, 416 (2007) *aff'd*, 405 Md. 43, 949 A.2d 639 (2008) (noting that zoning generally "is one means by which planning is implemented").

[24] In *Rylyns Enterprises*, there is a hint that there may be some difference regarding conditional zoning when applied to floating zones. *See* 372 Md. at 569, 814 A.2d at 502 (holding that the Maryland Code, as it stood then, did not authorize conditional use rezoning generally "insofar as Euclidian Zones are concerned[,]" but not

(Continued…)

granted expressly by the relevant zoning enabling statute.[25] *See Rylyns Enterprises*, 372

Md. at 567-68, 814 A.2d at 500-01; *Baylis v. City of Baltimore*, 219 Md. 164, 166-170,

148 A.2d 429, 431-433 (1959).

Conditional zoning, where authorized, may be applied to both Euclidian and

floating zones as part of the grant of a piecemeal rezoning.[26] *See Bell*, 442 Md. at 555,

---

(…continued)
commenting on whether conditional rezoning was allowed for floating zones). The previous zone and the zone to which the property at issue in *Rylyns Enterprises* had been rezoned were both Euclidian zones, but we noted that floating zones "involve a different set of analytical assumptions than do Euclidean zones." *Rylyns Enterprises*, 372 Md. at 533 n.9, 814 A.2d at 480 n.9. Because there is no challenge in the present case to whether conditional zoning is permitted with regard to the grant of a floating zone, we move on.

[25] As indicated *supra* note 14, the uniformity requirement, at least with respect to land uses, is mandated by statute. *Anderson House*, 402 Md. at 713, 939 A.2d at 130; *see also Rylyns Enterprises*, 372 Md. at 568-571, 814 A.2d at 501-03 (holding that non-uniform design requirements within a Euclidian zone, as opposed to use regulation, does not violate the uniformity requirement).

[26] Conditional rezoning seems a natural fit with floating zones. To rezone a property to a floating zone, the zoning authority must find, among other things, that the rezoning will be compatible with the surrounding neighborhood. *Rylyns Enterprises*, 372 Md. at 539 n.15, 814 A.2d at 484 n.15 (citing *Richmarr Holly Hills, Inc. v. Am. PCS, L.P.*, 117 Md. App. 607, 640, 701 A.2d 879, 895 (1997)). The conditions imposed on the rezoned property may be used to make compatible an otherwise incompatible rezoning.

Although the zoning authority may rezone a property into a Euclidian zone only upon a threshold finding of a mistake of fact in the previous comprehensive rezoning or original zoning or an unforeseen change in the neighborhood occurring since then, the zoning authority is not required to rezone the property after making such a finding, unless a failure to do so would deprive the property owner of all economically viable use of the property. *Rylyns Enterprises*, 372 Md. at 539, 814 A.2d at 483. Conditional zoning may provide assurances to the zoning authority and surrounding community in close cases, or induce the zoning authority to grant the requested rezoning (where allowable but not required), subject to conditions that will benefit the public.

113 A.3d at 649. Although conditional zoning introduces flexibility, rezoning a property with conditions does not obviate the necessity for the zoning authority to make the underlying legislative findings required for the grant of the Euclidian or floating rezoning. *Id.*

When the restrictions imposed by conditions of rezoning regulate elements such as design, layout, siting, appearance, and landscaping, conditional zoning is related closely to planning. *Cf. Gaster*, 285 Md. at 246, 401 A.2d at 672 (stating that planning is concerned with the "development of a community . . . with respect to streets, parks, civic beauty, industrial and commercial undertakings, [and] residential developments . . .") (quoting 1 Yokley, *supra* § 1-2). In *Rylyns Enterprises,* we reasoned that the imposition of design conditions, as opposed to use conditions, was similar to subdivision regulation. *Rylyns Enterprises*, 372 Md. at 568, 814 A.2d at 501. Subdivision regulation is one of the key methods by which planning is implemented. *See Richmarr*, 117 Md. App. at 645-46, 701 A.2d at 898.[27]

### D. Planning in General

In its broadest sense, planning is older than recorded history. 1 Norman Williams, Jr. & John M. Taylor, *American Land Planning Law* § 1:5 (3rd Ed. 2003) [hereinafter *Am. Land Planning*] (stating that "maps of some prehistoric cities show at least a street

---

[27] We do not suggest that conditional zoning is not zoning. The conditions are imposed through piecemeal rezoning and, to the extent that they pertain to the uses of land, are implementation of the zoning power. When a zoning authority imposes conditions on a rezoning that are related to planning, it is implementing the planning power through a zoning technique and procedure, thereby exercising both zoning and planning powers.

system laid out on a coordinated basis, and some careful use of monumental sites"); *cf.* Duodecim Tabularum, http://avalon.law.yale.edu/ancient/twelve_tables.asp (establishing some site planning principles in ancient Rome, adopted in 449 B.C.E.) Attempts to coordinate the interrelated aspects of physical, social, and economic development, however, are a more recent phenomena. 1 *Am. Land Planning Law* § 1:5; 1 *Rathkopf's The Law of Zoning and Planning* § 1:41; *cf.* Julian Conrad Juergensmeyer & Thomas E. Roberts, *Land Use Planning and Development Regulation Law* § 2:2 (3d ed. 2013) [hereinafter *Land Use Planning and Development Regulation Law*] (describing planning as it existed in colonial America). Statutes formalizing, directing, and empowering broadly local planning were enacted after zoning enabling statutes generally. 1 *Rathkopf's The Law of Zoning and Planning* § 1:41.

### 1. Plans

Plans are developed to guide the implementation of land use controls and zoning in a rational way that is beneficial to the public. *Land Use Planning and Development Regulation Law* § 2:9; *see Maryland-Nat. Capital Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 86, 985 A.2d 1160, 1167 (2009). "Plans are long term and theoretical, and usually contain elements concerning transportation and public facilities, recommended zoning, and other land use recommendations and proposals." *Rylyns Enterprises*, 372 Md. at 529, 814 A.2d at 477; *see also Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 86, 985 A.2d at 1167 (quoting 1 *Am. Law Zoning* § 5-2) (listing the general purposes of comprehensive plans).

23

Counties and municipal corporations are required generally to adopt, amend, and execute a "comprehensive plan." LU §§ 1-405, 3-101.[28] In the abstract, a comprehensive plan "is 'more than a detailed zoning map and should apply to a substantial area, be the product of long study, and control land use consistent with the public interest." *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 85, 985 A.2d at 1167 (citing Yokley, *supra* § 5–2). This plan must be well thought out and consider the common needs of a particular area. *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 85, 985 A.2d at 1167 (citing Yokley, *supra* § 5–2) The Land Use Article of the Maryland Code requires certain elements to be contained in comprehensive plans. LU §§ 1-406, 3-102. The preparation of a comprehensive plan is conducted by a planning commission and presented to the local legislature for adoption. *See* LU §§ 1-406(a)(1), 1-415, 3-202.

---

[28] We pause here (although we could have done so earlier) to note that the Land Use Article of the Maryland Code was adopted in 2012. *See* 2012 Md. Laws ch. 468. Prior to that, the Maryland-Washington Regional District Act ("RDA") was contained in Art. 28 of the Maryland Code. The recodification represented by the 2012 Land Use Article was not intended to include substantive amendments to its predecessor statutes. 2012 Md. Laws ch. 468, *see also* Land Use Article Review Committee, *Summary Report on Chapter 426 of the Acts of 2012*, at 1. To the extent that there may be differences that are material between these enactments, as applicable to the present case, and where consideration of the previous language may be helpful, we shall point them out as we proceed from this point.

The actions of the District Council at issue in the present case occurred before the recodification of the Regional District Act in the Land Use Article. *See* 2012 Md. Laws ch. 468. The statutory provisions relevant to this case, however, were not changed substantively during the 2012 recodification. For the purposes of providing an overview of the land use procedures in the Regional District, we refer generally to the Land Use Article. Because the determination of this dispute, however, depends on the Maryland Code as it was at the time of the relevant actions, we will refer occasionally to key prior sections of the Code when discussing the merits of the case. The changes to the RDA as well were generally non-substantive. 2012 Md. Laws ch. 468.

24

The plan-creation process is different slightly within the Maryland-Washington Regional District, which consists of most of Prince George's and Montgomery counties, than elsewhere in the State. Within the Regional District, two types plans are required: (1) a "general plan" containing, at a minimum, recommendations for development in the respective county and supporting analysis; and, (2) "area master plans" pertaining to local planning areas into which each county is divided. These plans are prepared by the Maryland-National Capital Park & Planning Commission (which is composed of separate planning boards for each county; the two boards sit together on bi-county issues and separately on matters that pertain purely to its respective county) and must be approved by the local legislature of the respective county. *See* LU §§ 14-101(b), 14-101(f), 21-202, 21-208(a). Area master plans govern typically specific, smaller portions of a county and are usually more detailed than general plans overlapping the same area. *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 89, 985 A.2d at 1169 (2009) (citing *Garner v. Archers Glen Partners, Inc.*, 405 Md. 43, 48 n.5, 949 A.2d 639, 642 n.5 (2008). Separate functional master plans, addressing transportation routes and facilities, hospitals and health centers, parks, police stations, fire stations, and significant sites and structures, may also be adopted and approved. *See* LU §§ 21-106, 21-107.

Proposals for land use contained in a plan constitute a non-binding advisory recommendation, unless a relevant ordinance or regulation, or specific zoning, subdivision, or other land use approval, make compliance with the plan recommendations mandatory. *Greater Baden-Aquasco Citizens Ass'n*, 412 Md. at 98-101, 985 A.2d at 1174-77; *Rylyns Enterprises*, 372 Md. at 530-31, 814 A.2d at 478-79; *see also Gaster*,

25

285 Md. at 250, 401 A.2d at 674 (holding that a local ordinance enacting subdivision regulations required compliance with the plan). The advisory nature of plans makes direct judicial review of their adoption and approval infrequent, at best. *Cf.* LU § 21-104(b)(4) (withholding explicitly from judicial review plans created under the Regional District Act).

*2. Subdivision*

Subdivision controls implement plans (assuming the plan recommendations are deemed prudent and timely of fruition) and fall generally under the planning power delegated to local governments. *See Remes v. Montgomery Cnty.*, 387 Md. 52, 73, 874 A.2d 470, 482 (2005); *Coffey v. Maryland-Nat'l Capital Park & Planning Comm'n*, 293 Md. 24, 29, 441 A.2d 1041, 1043 (1982) ("Subdivision controls are imposed for the purpose of implementing a comprehensive plan for community development."); 1 *Am. Land Planning Law* § 22:1; *Land Use Planning and Development Regulation Law* § 7:3. Although "subdivision" refers to the division and consolidation of parcels of land, or the land that has been divided or consolidated, LU §§ 1-101(r), 14-101(q), the regulations controlling how, when, and under what circumstances subdivision may occur are used to promote development that is beneficial to the community, *see Surina*, 400 Md. at 689, 929 A.2d at 915; *Coffey*, 293 Md. at 27-28, 441 A.2d at 1043.

Subdivision controls aim to ensure that developments will be able to support the uses for which the land is zoned. *Surina*, 400 Md. at 689, 929 A.2d at 915. Among the considerations addressed are the aesthetic planning of the neighborhood, safety and convenience of streets and walkways, access by police and fire protection authorities,

26

adequacy of utilities and other infrastructure, and the off-site effect of the development. 1 James A. Kushner, *Subdivision Law and Growth Mgmt.* § 1:5 (2d ed. 2012). Subdivision regulations attempt to respond to issues that are not so well-addressed through zoning, the initial step in the development process.

### E. The Maryland-Washington Regional District Act

The property at issue in the present case is within the Prince George's County portion of the Maryland-Washington Regional District ("Regional District"), as recognized in the Maryland-Washington Regional District Act ("RDA"), codified previously in Art. 28 of the Maryland Code, and codified now in Division II of the Land Use Article of the Maryland Code.[29] Therefore, the RDA and the Prince George's County Code ("PGCC") govern the requirements and procedures at issue here.

---

[29] The Maryland-Washington Regional District Act ("RDA") may be traced to 1927. Chapter 448 of the Laws of Maryland of 1927 established the Maryland-National Capital Park & Planning Commission and the Maryland-Washington Metropolitan District ("Metropolitan District"). The Commission was comprised of six commissioners appointed by the Governor. 1927 Md. Laws ch. 448, at § 6. Within the Metropolitan District, encompassing roughly the area between the District of Columbia and what is now the Capital Beltway, zoning and planning authority was divided between the Commission and the county commissioners of Prince George's and Montgomery counties. *Prince George's Cnty. v. Maryland-Nat'l Capital Park & Planning Comm'n*, 269 Md. 202, 204-06, 306 A.2d 223, 226 (1973); *see also* 1927 Md. Laws ch. 448, at § 1 (describing the boundaries of the Metropolitan District). The counties were authorized to zone, provided that the regulations and zoning maps mirrored the Commission's plan for the Metropolitan District or the Commission approved any deviation from such plan. 1927 Md. Laws ch. 448, at § 23.

In Chapter 714 of Laws of Maryland of 1939, the General Assembly created the Maryland-Washington Regional District ("Regional District"), which was also under the jurisdiction of the Maryland-National Capital Park & Planning Commission. 1939 Md. Laws ch. 714; *Prince George's Cnty. v. Maryland-Nat'l Capital Park & Planning*

(Continued…)

The RDA is the essential source of the delegation by the State of zoning authority

to Prince George's County for the areas of Prince George's County within the Regional

District.[30, 31] *E.g.*, *Prince George's Cnty. v. Ray's Used Cars*, 398 Md. 632, 646, 922 A.2d

---

(…continued)
*Comm'n*, 269 Md. at 206, 306 A.2d at 226. "[T]he Commission's 'park and planning functions in the district were separated, and the Maryland-Washington Regional District . . . was created as the planning and zoning district.'" *Id.* (quoting *Prince George's Co. v. Laurel*, 262 Md. 171, 174, 277 A.2d 262, 264 (1971)).

The General Assembly, through Chapter 992 of the Laws of Maryland of 1943, repealed and replaced the 1939 iteration with amendments as "a bi-county act applicable to the Maryland-Washington Regional District in Montgomery and Prince George's Counties and not as a public local law of either county . . . ." *Prince George's Cnty. v. Maryland-Nat'l Capital Park & Planning Comm'n*, 269 Md. at 206, 306 A.2d at 226. The act was to be referred to as "the Maryland-Washington Regional District Act." 1943 Md. Laws ch. 992, at § 1. The Legislature clarified further in 1943 that the act was a public general law, not a public local law or the law of either Prince George's or Montgomery County. 1943 Md. Laws ch. 1008; *Prince George's Cnty. v. Maryland-Nat'l Capital Park & Planning Comm'n*, 269 Md. at 206, 306 A.2d at 226.

The RDA was re-cast in 1959 in substantially the structure prevailing today. Chapter 780 of the Laws of Maryland of 1959 repealed and replaced all the former acts pertaining to the Regional District and Metropolitan District, as well as certain sections of the codes of Montgomery and Prince George's counties. *Prince George's Cnty. v. Maryland-Nat'l Capital Park & Planning Comm'n*, 269 Md. at 206, 306 A.2d at 226. The 1959 act expanded the Regional District, created a method by which additional land use functions might be assigned, created the county planning boards as distinct entities from the Commission, and designated the local legislative bodies of Prince George's and Montgomery counties as the primary zoning authorities. *See* 1959 Md. Laws ch. 780.

[30] In supplementation of the RDA, the Express Powers Act, codified previously in the Maryland Code as Article 25A, but now found in Title 10 of the Local Government Article, confirms Prince George's County's zoning and planning authority as a charter county delineated in Division I of the Land Use Article. Maryland Code (2013), Local Government Article, § 10-324(a) ("LG") states: "[a charter] county may enact local laws relating to zoning and planning to protect and promote public safety, health, morals, and welfare . . . ." LG § 10-324(c) makes clear, however, that the section does not "grant to [a charter] county powers in any substantive area not otherwise granted to the county by

(Continued…)

495, 503 (2007); *Cnty. Council of Prince George's Cnty. v. Brandywine Enterprises, Inc.*, 350 Md. 339, 342, 711 A.2d 1346, 1347 (1998). The RDA regulates planning and zoning within the Regional District, which includes most of Prince George's and Montgomery Counties. To execute this delegation, the RDA divides broadly authority related to zoning, planning, and other land use matters between the county (district) councils, the Maryland-National Capital Park & Planning Commission, and the county planning boards.[32]

---

(…continued)

other public general law or public local law . . . ." Further, LG § 10-206(b) prevents charter counties from exercising their powers when such powers are preempted or in conflict with a public general law. Thus, we concern ourselves in the present case with the RDA and the County Code.

In *Prince George's County v. Maryland-National Capital Park & Planning Commission*, *supra*, we considered the implications of the then recently adopted Prince George's County Charter on the distribution of functions under the RDA between the County Council and the Commission. 269 Md. at 210-223, 306 A.2d 228-235. We held that the Regional District Act is a public general law which may not be amended or superseded by the Charter. *Id.*, 269 Md. at 223, 306 A.2d at 235. "The fact that a public general law permits or directs differences in matters of mere administrative detail suited to the particular needs of the localities does not make it any less a public general law . . . ." *Id.*, 269 Md. at 225, 306 A.2d at 236 (quoting *Norris v. Mayor and City Council of Baltimore*, 172 Md. 667, 681, 192 A. 531, 537 (1937)) (internal quotation marks omitted). To the extent that the Charter, or the ordinances adopted thereunder, conflict with the RDA, the Charter and ordinances are invalid and the RDA governs. *See Id.*, 269 Md. at 225-34, 306 A.2d at 236-41 (holding that the RDA governed in the disagreements between the Prince George's County Charter and the RDA at issue in that case).

[31] The Maryland-Washington Regional District encompasses "the entire area of Prince George's County, except for the City of Laurel as it existed on July 1, 2008." LU § § 20-101(b).

[32] Other administrative bodies, not figuring in the present case, are authorized also to execute provisions of the RDA. The RDA provides for board of appeals, to which a

(Continued…)

The district councils for Prince George's County and Montgomery County consist of their respective county councils. LU §§ 22-101, 14-101. They have primary legislative authority. The district councils are authorized to adopt and amend zoning ordinances and the accompanying zoning maps for their counties, LU §§ 22-104, 22-201, and to develop processes and procedures to ensure that development complies with zoning requirements, *see, e.g.,* LU §§ 20-503(a), 22-214(e). They have a role also in the creation of plans by establishing procedures for the planning process, *see* LU § 21-208(a), and approving master plans for their counties, *see* LU § 21-212. Moreover, the district councils may delegate certain responsibilities and authority to other local governmental units or tribunals, subject to limitations as may appear in the RDA.

The Maryland-National Capital Park & Planning Commission ("Commission" or "MNCPPC"), as its name suggests, administers parks, public recreation, and, in conjunction with the governments of Prince George's and Montgomery counties, and their respective Planning Boards (which are constituent parts of the Commission), participates in the planning of development within the Regional District. *See, e.g.*, LU §§ 15-102, 17-101, 20-205, 21-101, 21-103. The MNCPPC consists of ten members, five of whom are residents of Montgomery County, and five of whom are residents of Prince George's County (each group of five constitute the Planning Board for its respective

(…continued)
district council may direct determinations regarding, for example, variances. LU §§ 22-301, 22-309, 22-310, 22-311. Also, a district council may delegate certain zoning actions, such as special exceptions, to a hearing examiner, whose decision may be final unless appealed to the district council or take for decision by the council on its initiative. LU § 22-206.

county). LU § 15-102(a)(2). The governments of Prince George's and Montgomery counties appoint the members from their respective jurisdictions. *See* LU § 15-102(a)(3). Among other things, the RDA authorizes the MNCPPC to: (1) acquire property for parks, forests, roads, and other public spaces, LU § 17-101; (2) rename streets and highways and number and renumber houses within the district to fix mistakes, remove confusion, and establish uniformity, LU § 17-212; (3) acquire, improve, and manage land for flood control purposes, LU § 17-213; (4) establish road grades in Montgomery County, LU § 20-401; and, (5) recommend amendments to the zoning laws and subdivision regulations, LU § 20-203. The Commission originates and produces also the proposed general and master plans for the Regional District.[33] *See* LU § 21-202, 21-203(a).

We perceive also that the RDA seeks to foster a degree of independence in and immunize, to some extent, the Commission from undue grass roots and hierarchical political influence. The RDA directs that commissioners must be individuals of "ability" and "experience."[34] LU § 15-102(b). Of the five commissioners from each county, no

---

[33] A plan is adopted by majority vote of the Commission. *See* LU § 21-203(a). At least three commissioners from Prince George's County and three commissioners from Montgomery County (a majority from each delegation), however, must vote affirmatively, unless the plan affects only one county. *See* LU § 21-203(a). An area master plan or a functional master plan that lies entirely within one county may be adopted by the affirmative votes of three commissioners from that county's planning board. LU § 21-203(a)(2).

[34] The RDA does not describe for what specific markers of ability and experience the county governments are to look during the selection process. Nevertheless, the provision demonstrates the intent of the Legislature with regard to achieving the relatively apolitical nature of the Commission.

more than three may be members of the same political party, LU § 15-102(c)(1), and if a commissioner is appointed to fill an unexpired term, he or she must be a member of the same political party as the vacating commissioner. LU § 15-102(d)(5). Finally, "[a] commissioner may not be selected as representing or supporting any special interest."[35] LU § 15-102(c)(2).

The RDA evinces also an intent of the State Legislature to prevent corruption of or the appearance of impropriety by the commissioners. LU § 15-120 prohibits commissioners from: (1) participating in decisions as a commissioner in which the commissioner or the commissioner's immediate family has a financial interest; (2) taking certain employment while a commissioner; (3) soliciting or accepting gifts, disclosing confidential information, or using such information for private gain; or, (4) influencing other county or State officials in the conduct of their duties. Commissioners are required by the RDA to disclose publically any conflict with his or her official duties. LU § 15-120(g).

---

[35] Additional provisions specific to Prince George's County or Montgomery County exist. In Prince George's County, appointments must "attempt to provide reasonable geographic balance with respect to the commissioners' places of residence" and provide the resolution announcing the appointment of a commissioner must "describe the resulting geographic distribution and provide that appropriate explanations." LU § 15-103(b)(4). In Montgomery County, applicants for appointment as a commissioner must provide financial disclosures and the Montgomery County Council must hold interviews regarding possible or potential conflicts of interest, which interviews become public if the applicant is appointed. LU § 15-104.

As noted earlier, the planning board for a county consists of the commissioners of the MNCPPC appointed from that county.[36] LU § 20-201; *see also* LU §§ 15-102, 15-103. The planning boards are "responsible for planning, subdivision, and zoning functions that are primarily local in scope[,]" *see* LU § 20-202, and not otherwise placed under another agency's purview, *see, e.g.*, LU § 22-104 (granting to the Montgomery County and Prince George's County district councils authority to adopt and amend zoning law). The county planning boards have exclusive jurisdiction over local functions within their purview and any mandatory referrals by the county government.[37] LU § 20-202(b).

---

[36] In Prince George's County, the County Executive appoints commissioners to the Commission and the County Planning Board, subject to approval by the County Council. LU § 15-103(b).

[37] A county body or county official must refer to that county's planning board for consideration of the location, character, grade, and extent of the activity before the county may consummate any of the following:

> (1) acquiring or selling land;
> (2) locating, constructing, or authorizing:
>    (i) a road;
>    (ii) a park;
>    (iii) any other public way or ground;
>    (iv) a public building or structure, including a federal building or structure; or
>    (v) a publically owned or privately owned public utility; or
> (3) changing the use of or widening, narrowing, extending, relocating, vacating, or abandoning any facility listed [above].

LU § 20-301; *see also* LU § 20-302(b) (requiring referrals from a county to be made to that county's planning board).

The RDA does not itemize exhaustively the local functions that are within the exclusive jurisdiction of the planning boards. LU § 20-202(b)(1) provides, however, in relevant part:

> A county planning board has exclusive jurisdiction over:
> (i) local functions, including:
>     1. the administration of subdivision regulations;
>     2. the preparation and adoption of recommendations to the district council with respect to zoning map amendments;[38] and
>     3. the assignment of street names and house numbers in the regional district . . . .

The Legislature's use of "including" indicates that the local functions listed in LU § 20-301 are not intended to be an exhaustive list, but rather examples of local functions.

The fundamental division of zoning, planning, and land use authority in the RDA grants regional authority to the Commission, broad local authority to the county planning boards, and specific local authority to the county district councils.[39] Although the RDA grants authority to the district councils through discrete provisions, unlike the broader grant of authority provided the planning boards, such authority is not narrow. The district councils have broad legislative authority. *See, e.g.*, LU §§ 20-104 (granting authority to

---

[38] When considering a zoning map amendment, the Planning Board provides merely a recommendation to the District Council, LU §§ 22-208, 20-202(b)(1)(i). The District Council decides whether to grant the amendment. LU § 22-206.

[39] The RDA grants other internal operating authority to the Commission and the planning boards that is not involved directly with the regulation of land use. The Commission, for example, is empowered to appoint park police, LU § 17-301, establish an adequate comprehensive insurance program, LU § 15-114, create publications describing land use law within the Regional District, LU § 15-116, and hire employees, *see* LU § 16-102. The planning boards have also administrative control over their employees. LU § 20-204.

create and amend zoning law), 20-105 (granting authority to district councils to create a program for the transfer of development rights), 20-503 (granting authority to the district councils to create "a process to raise a zoning question before the preparation of all structural specifications of a building or structure that may be required for a complete building permit"), 22-104 (granting authority to the "governing body of Montgomery County or Prince George's County" to adopt and amend subdivision regulations).

## F. Comprehensive Design (Floating) Zones in Prince George's County

The District Council for Prince George's County ("District Council") classifies as "comprehensive design zones" certain types of floating zones established pursuant to the RDA. PGCC § 27-109. Explaining the reasons for creating comprehensive design zones, PGCC § 27-476 states:

> (1) It is within the ultimate objectives of the District Council's authority (under Article 28 of the Annotated Code of Maryland) to use recent planning and zoning innovations;
> (2) The demands for housing, commercial and industrial activities, and related public facilities and services are undergoing substantial and rapid changes, requiring improved methods of land use control; and
> (3) There is a need to encourage the optional and imaginative utilization of land contemplated by Comprehensive Design Zones in order to:
>     (A) Improve the total environment;
>     (B) Lessen the public costs associated with land development and use;
>     (C) Fulfill the purposes of each individual Comprehensive Design Zone; and
>     (D) Fulfill the recommendations and purposes of the General Plan, Master Plans, or Sector Plans in selected areas.

Each type of comprehensive design zone has also its own goals, but all are aimed generally at encouraging good development. *See* PGCC § 27-478(a).

To take advantage of the flexibility provided by the comprehensive design zones, a developer must seek first to change the present zoning of a parcel by submitting an application for zoning map amendment and accompanying Basic Plan.[40] PGCC §§ 27-187, 27-195(a)(1). The application and Basic Plan must demonstrate that the entire proposed development will conform to the relevant criteria for the proposed zone. PGCC § 27-195(b). The Planning Board provides the District Council with an analysis and recommendation regarding the application. PGCC § 27-192; *see also* LU §22-208. If the District Council approves the zoning map amendment, it may specify particular permitted land use types and planning and development guidelines that must be followed by the applicant and subsequent owners in the subsequent approval processes. PGCC 27-195(a)(1). The District Council may impose also conditions on the property along with the new zoning classification. PGCC § 27-195(c); *see also* LU § 22-214(a).

If the District Council approves the application and Basic Plan, thereby rezoning the property, the applicant must submit next a Comprehensive Design Plan ("CDP") and

---

[40] The Basic Plan shows at a minimum the "general land use types; range of dwelling unit densities, including the base, minimum, and maximum densities; and commercial/industrial intensities, general circulation pattern, general location of major access points[,] and land use relationships . . . ." PGCC § 27-195(a)(1). It may also show "specific land use types and their general locations within the development . . . ." PGCC § 27-195(a)(1).

a Specific Design Plan ("SDP").[41] PGCC § 27-487(a). The CDP is the second step in the evolutionary detailing of what the applicant proposes to develop on the property. The applicant must provide, among other things, preliminary drawings, details, and designs of the actual proposed development. PGCC § 27-518(b).[42] The third step, the SDP,[43]

---

[41] A zoning map amendment with accompanying Basic Plan, CDP, and SDP may be submitted and reviewed as a package, if the applicant wishes. PGCC § 27-532. It is more often the case, however, that an applicant submits only the map amendment application and Basic Plan initially, in order to determine if it will be approved, thus justifying undertaking the additional expense and time to submit a CDP or SDP, whether sequentially or as a package. *Cf.* PGCC § 27-531 (authorizing a combined application for Comprehensive Design and Specific Design Plan approval).

[42] PGCC § 27-518(b) requires CDPs to include:

> (1) A reproducible drawing (with ten (10) prints) showing the proposed development of the property. This drawing shall be in conformance with the approved Basic Plan. The drawing shall show the approximate location and proposed density of dwelling units, nonresidential building intensity, and the zoning of adjoining properties;
> (2) A schedule and text, including the delineation of any staged units to be developed at different times;
> (3) A description of design principles proposed to govern the project, including design guidelines set forth in Section 27-274 of Part 3, Division 9, of this Subtitle for the M-A-C, L-A-C, E-I-A, R-U, R-M, and R-S Zones, and in Section 27-514.06 for the V-M and V-L Zones;
> (4) The total number of acres in the proposed project and the percentage thereof proposed for various uses;
> (5) The number of dwelling units proposed (by type of dwelling unit) for each staged unit;
> (6) The estimated residential or employment population for each staged unit;
> (7) The location and extent of any proposed commercial area;
> (8) The anticipated priority of development of each staged unit;

(Continued…)

(…continued)

    (9) The standards proposed to be used for height, open space, building intensity, population density, and public improvements;

    (10) Engineering feasibility studies (including traffic engineering studies), as necessary;

    (11) An approved Natural Resource Inventory;

    (12) A Type 1 Tree Conservation Plan prepared in conformance with Division 2 of Subtitle 25 and The Woodland and Wildlife Habitat Conservation Technical Manual or Standard a Letter of Exemption;

    (13) A statement of justification describing how the proposed design preserves and/or restores the regulated environmental features to the fullest extent possible; and

    (14) Where a Comprehensive Design Plan proposes to include an adaptive use of a Historic Site, the application shall include:

      (A) Text describing the nature of the proposed adaptive use, including a description of how the use will be integrated into the design and theme of the Historic Site;

      (B) A preliminary evaluation of historic landscape features through field investigation; and

      (C) Preliminary architectural elevations within the environmental setting of the Historic Site.

[43] If the development of the comprehensive design zone includes subdividing the property, the subdivision approval process may overlap somewhat with the CDP and SDP approval process. A preliminary plan of subdivision may accompany a combined CDP and SDP application. *See* PGCC § 24-119(b). The final plat approval occurs after the approval of the CDP and SDP. PGCC § 24-119(f). The Planning Board requires the proposed subdivision to conform to the CDP and SDP. *See* PGCC § 24-121(a) ("The Planning Board shall require that proposed subdivisions . . . [are] platted in conformance with all of the requirements of the Zoning Ordinance applicable to the subject property."). The subdivision process is within the exclusive jurisdiction of the Planning Board, and the determinations of the Planning Board are not subject to the review, appellate or otherwise, by the District Council. *See* LU § 23-102(a); *County Council of Prince George's County v. Dutcher*, 365 Md. 399, 425, 780 A.2d 1137, 1152 (2001) (holding that the RDA, by its silence on the matter, did not authorize an appeal to the District Council of a Planning Board decision regarding a non-cluster preliminary plan of subdivision).

includes additional and greater development detail. *See* PGCC § 27-527(b).[44]

Development and use of the property must comply with the approved SDP, which binds

future owners as well as the applicant, unless a revision is sought and approved. PGCC

§§ 27-529, 27-530.

The Planning Board, after its technical planning staff reviews an applicant's

submissions and makes a recommendation, holds a public evidentiary hearing.

Thereafter, it approves or denies a CDP or SDP (with or without conditions). PGCC §§

27-522, 27-528. To receive approval, the plans must meet certain requirements set out in

PGCC §§ 27-521 and 27-528.

---

[44] PGCC § 27-527(b) requires SDPs to include (at least):

> (1) A reproducible site plan showing buildings, functional use areas, circulation, and relationships between them; and in the V-M and V-L Zones, a three-dimensional model and a modified grid plan, which may include only the Village Proper, and any Hamlet, which incorporates plan concepts, spatial and visual relationships, streetscape, and other characteristics of traditional rural villages shall be provided prior to Planning Board and District Council review;
> (2) Reproducible preliminary architectural plans, including floor plans and exterior elevations;
> (3) A reproducible landscape plan prepared in accordance with the provisions of the Landscape Manual;
> (4) A Type 2 Tree Conservation Plan prepared in conformance with Division 2 of Subtitle 25 and The Woodland and Wildlife Habitat Conservation Technical Manual or Standard Letter of Exemption;
> (5) An approved Natural Resource Inventory; and
> (6) A statement of justification describing how the proposed design preserves or restores the regulated environmental features to the fullest extent possible.

PGCC § 27-521 details several findings that the Planning Board must make in order to approve a CDP. The first is that the CDP is in conformance with the approved Basic Plan, and certain zoning requirements. *See* PGCC §§ 27-521(a)(1), 27-223(b)(3)(B), 27-195.[45, 46] The CDP must demonstrate more, however, than showing simply that the proposed development would comply with the property's zoning. Among other things, the CDP must demonstrate: (1) that it "would result in a development with a *better environment* than could be achieved under other regulations[,]" PGCC § 27-

---

[45] PGGC §§ 27-521(a)(1) requires for approval of a CDP a finding that:

> The plan is in conformance with the Basic Plan approved by application per [PGCC §] 27-195; or when the property was placed in a Comprehensive Design Zone through a Sectional Map Amendment per [PGCC §] 27-223, was approved after October 1, 2006, and for which a comprehensive land use planning study was conducted by Technical Staff prior to initiation, is in conformance with the design guidelines or standards intended to implement the development concept recommended by the Master Plan, Sector Plan, or Sectional Map Amendment Zoning Change . . . .

PGCC § 27-223 indicates that "[t]he design guidelines or standards intended to implement the development concept recommended by the Master Plan, Sector Plan, or the Sectional Map Amendment Zoning Change may constitute the Basic Plan for development on property where a Comprehensive Design Zone is established through a Sectional Map Amendment."

[46] PGCC § 27-195(a) indicates that the requirements of the Basic Plan are incorporated as part of the zoning of the parcel. LU § 22-214(a) authorizes the District Council to "consider and adopt any reasonable requirements, safeguards, and conditions" that may be necessary to prevent adverse effects on surrounding properties or would lead to better development of the Regional District. In the present case (as we shall explain later), the District Council termed the conditions on rezoning imposed in the 2004 rezoning "Basic Plan Conditions," which is not inconsistent with the structure authorized by LU § 22-214 and implemented by PGCC § 27-195.

521(a)(2) (emphasis added); (2) "the preservation and/or restoration of the regulated environmental features in a natural state to the *fullest extent possible*[,]" PGCC § 27-521(a)(11) (emphasis added); and, (3) that "[a]pproval is *warranted* by the way in which the Comprehensive Design Plan includes design elements, facilities, and amenities, and satisfies the needs of the residents, employees, or guests of the project[,]" PGCC § 27-521(a)(3) (emphasis added). Although the County Code indicates the appropriate considerations, the Planning Board (and its technical planning staff) must exercise expertise and judgment to determine whether to approve a CDP, wielding necessarily significant discretion in that endeavor. The considerations governing the decision are the essence of planning.[47]

The Planning Board's discretion to deny an SDP is cabined. *See* PGCC § 27-528(c) ("The Planning Board may only deny the Specific Design Plan if it does not meet the requirements of Section 27-528(a) and (b), above."). The Planning Board must approve an SDP unless the submission fails to: (1) conform to the CDP, the Landscape

---

[47] As we stated in *Bd. of Cnty. Comm'rs of Cecil Cnty. v. Gaster*, 285 Md. 233, 401 A.2d 672 (1979):

> [P]lanning . . . indicates the development of a community, not only with respect to the uses of lands and buildings, but also with respect to streets, parks, civic beauty, industrial and commercial undertakings, residential developments and such other matters affecting the public convenience and welfare as may be properly embraced within the police power.

285 Md. at 246, 401 A.2d at 672 (quoting 1 E. C. Yokley, *Zoning Law and Practice* § 1-2 (4th ed. 1978)).

Manual, or the applicable design guidelines and regulations; (2) demonstrate that the development will be served adequately by existing or programed public facilities within a reasonable time; (3) demonstrate that surface water will be handled adequately; (4) conform with an approved Type 2 Tree Conservation Plan; and, (5) demonstrate that regulated environmental features are preserved and/or restored to the full extent possible.[48] PGCC § 27-528(a). Nonetheless, the Planning Board must still exercise significant agency expertise and judgment in making these determinations.

The decision of the Planning Board as regards a CDP or an SDP is subject to review by the District Council. PGCC §§ 27-523(a), 27-528.01. Any person of record before the Planning Board may appeal the decision to the District Council (which did not occur in the present case), or the District Council may elect on its initiative to review ("call up") the decision (which is what happened here). *Cf.* PGCC § 27-523(a). The District Council may affirm, reverse, or modify the decision of the Planning Board, or remand the case to the Planning Board for further consideration. PGCC § 27-523(a). In the present case, we are asked to consider what is the proper role of the District Council in reviewing decisions of the Planning Board and the standard(s) by which the District Council may review the Planning Board's decision.

---

[48] In certain situations, the SDP must meet additional criterial. For example, "in the L-A-C Zone, if any portion lies within one-half (1/2) mile of an existing or Washington Metropolitan Area Transit Authority Metrorail station, the regulations set forth in Section 27-480(d) and (e) [apply] . . . ." PGCC § 27-528(a)(1). If the SDP concerns "Infrastructure," the Planning Board must find additionally that the SDP "prevents offsite property damage, and prevents environmental degradation to safeguard the public's health, safety, welfare, and economic well-being for grading, reforestation, woodland conservation, drainage, erosion, and pollution discharge." PGCC § 27-528(b).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Now we shall bring down to earth somewhat this opinion. The property at the heart of this dispute (the "Edwards Property") is a triangular 4.14 acre parcel in Adelphi, Prince George's County. The parcel is bounded by Adelphi Road, Edwards Way, and Riggs Road. Zimmer Development Company ("Zimmer"), a national real estate developer based in Wilmington, North Carolina, wishes to construct on the Edwards Property a small retail center with a CVS store as the primary tenant.

The Edwards Property was zoned originally R-R (Rural Residential), a Euclidian single-family, detached residential zone, which would not allow development of a retail center on the Property. In 2004, after Edwards Commercial Properties'[49] submission of an application for a zoning map amendment of the parcel to L-A-C (Local Activity Zone),[50] a floating zone, together with a Basic Plan depicting how it would develop the

---

[49] Nothing we could find in the record extract describes precisely the relationship between Zimmer and Edwards Commercial Properties.

[50] The L-A-C zone is purposed to:

> (1) Establish (in the public interest) a plan implementation
> Zone, in which (among other things):
>     (A) Permissible residential density and building intensity
>     are dependent on providing public benefit features and
>     related density/intensity increment factors; and
>     (B) The location of the zone must be in accordance with
>     the adopted and approved General Plan, Master Plan,
>     Sector Plan, public urban renewal plan, or Sectional Map
>     Amendment Zoning Change;
> (2) Establish regulations through which adopted and approved
> public plans and policies (such as the General Plan, Master
> Plans, Sector Plans, public urban renewal plans, and Sectional

(Continued…)

43

property generally, the County Council for Prince George's County, sitting as the District Council, adopted Zoning Ordinance 10-2004 granting the requested rezoning to the L-A-C zone, subject to several conditions. Zoning Ordinance 10-2004 required as conditions the following:

> 1. The Basic Plan shall be revised to show the following rights-of-way along the frontages of the subject property: MD 212 – 40 feet from center line (toward the ultimate right-of-way of 80 feet); Adelphi Road – 50 feet from center line (toward the ultimate right of way of 100 feet); Edwards Way – 35 feet from center line (in accordance with Zoning Ordinance requirements adjacent to commercial zone).
>
> 2. The Applicant will provide a double left-turn lane along southbound/westbound MD 212 at the approach of Adelphi Road. Timing of this improvement will be determined at the preliminary plan of subdivision.

---

(…continued)
> Map Amendment Zoning Changes for Community, Village, and Neighborhood Centers) can serve as the criteria for judging individual physical development proposals;
> (3) Assure the compatibility of proposed land uses with existing and proposed surrounding land uses, and existing and proposed public facilities and services, so as to promote the health, safety and welfare of the present and future inhabitants of the Regional District;
> (4) Encourage and stimulate balanced land development;
> (5) Group uses serving public, quasi-public, and commercial needs together for the convenience of the populations they serve; and
> (6) Encourage dwellings integrated with activity centers in a manner which retains the amenities of the residential environment and provides the convenience of proximity to an activity center.

PGCC § 27-494.

44

3. Prior to the approval of the Specific Design Plan for the subject property, the applicant shall submit an acceptable traffic signal warrant study to the County Department of Public Works and Transportation (DPW&T) for the intersection of Adelphi Road and Edwards Way. The Applicant shall use a new 12-hour count and shall analyze signal warrants under total future traffic as well as existing traffic.

4. During the review of Preliminary Plan of Subdivision, the Applicant shall provide more detailed operational analyses at the intersections of MD 212/Edwards Way and MD212/site entrance. The scope of these analyses will be determined after approval of the proposed Basic Plan and in consideration of the permitted access to the site.

5. Total commercial development of the subject 4.14 acre site shall be limited to a maximum of 40,000 square feet.

6. During the Comprehensive Design Plan and subdivision review, the Applicant shall address the addition of public streets to accomplish access from Adelphi Road or obtain a variance from Section 24-121 of the Subdivision Regulations.

7. Development of the subject property shall have a woodland conservation threshold of 20 percent. If off-site mitigation is proposed, the first priority for mitigation sites shall be within the Anacostia Watershed.

8. During the Comprehensive Design Plan and Specific Design Plan review, the Applicant shall address the following issues:

  A. Architectural design shall be distinctive in order to create an image of quality and permanence.

  B. A build-to line shall be considered in order to create an inviting streetscape.

  C. The streetscape shall create a pedestrian-friendly environment with consideration of the following elements:

    (1) Street furniture including pedestrian lighting

(2) Trash receptacles

(3) Bike racks

(4) Pedestrian crosswalks should be a contrasting paving materials

(5) Need for bus stop[.]

D. Massive surface parking facilities adjacent to either Riggs or Adelphi Road shall be prohibited.

E. An architectural focal point and/or sculpture located within a green area shall be provided at the intersection of Adelphi and Riggs Road.

F. No loading and/or dumpster areas shall be visible from adjacent roadways.

G. The design plans shall address the entire property, so that the final development of the individual lots creates a visually cohesive development, compatible in regard to architectural treatment and site layout.

9. Additional conditions of approval:

A. The leadership of the Buck Lodge Citizen's Association, White Oak Manor Civic Association, and Hampton's Association will each nominate two representatives and one alternate to participate with the developer of the subject property in regular meetings, scheduled by the developer, during each of the phases of development (including but not limited to the Preliminary Plan of Subdivision, Comprehensive Design Plan, and Specific Design Plan) of the property.

B. At the time of Preliminary Plan Application, the developer of the subject property shall include the intersection of Metzerott Road and Riggs Road in its traffic study, to demonstrate the adequacy of transportation facilities in the surrounding area.

46

C. Any required widening and improvements to the public rights-of-way for Riggs Road, Adelphi Road, and Edwards Way shall include five-foot sidewalks, in accordance with applicable State and County Standards.

D. The developer of the subject property shall work with the Maryland State Highway Administration on the improvements to Riggs Road, Maryland Route 212, to provide a center turn lane to allow northbound traffic to make left turn turns into the subject property without impeding through traffic.

E. The developer of the subject property shall be responsible for payments for all road and intersection improvements necessary to mitigate any failing traffic conditions caused by the on-site development. Such improvements will be determined at the time of Preliminary Plan Review.

F. The developer of the subject property shall work with the various transit authorities and agencies to maintain the locations of the existing bus stops along Riggs Road and Adelphi Road. The developer shall construct a bus pull-off area to allow the loading and unloading of passengers out of the travel lanes of the roadways, within the public rights-of-way.

G. The developer of the subject property shall work with the Prince George's Department of the Environment, to utilize low impact stormwater management techniques to the degree practicable.

H. The developer of the subject property shall take all reasonable actions to alleviate and reduce the possibility of crime occurring on or adjacent to the property.

J.[51] The developer shall keep clean all areas of the subject property, during and after development.

---

[51] Sub-part "I" of Condition 9 was skipped in Zoning Ordinance 10-2004, for no apparent reason.

K. The developer shall incorporate trees, shrubs, open areas, flowers, walkways, and lighting into the site plan. The property shall be cleared of poorly lit or secluded areas, and adequate safety lighting shall be installed to improve visibility into the site and deter illegal activity.

10. The developer shall make its best efforts to include a restaurant as an ancillary tenant on the subject property.

Time passed. On 14 March 2011, Zimmer filed concurrently with the Commission a proposed Comprehensive Design Plan–1001 ("CDP–1001") and Specific Design Plan–1001 ("SDP–1001") for the development of the Edwards Property. On 28 July 2011, the Planning Board held a public hearing on the applications. The technical staff of the Planning Board, having reviewed the submissions, recommended their approval with conditions. CDP-1001 and SDP-1001 were found by the Planning Board to comply with the approved Basic Plan and the planning standards applicable to CDPs and SDPs for the L-A-C zone and, consequently, were approved subject to conditions substantially similar to those recommended by the technical staff.[52]

---

[52] The Planning Board's approval of CDP-1001 was subject to the following conditions:

1. Prior to signature approval of the plans, the applicant shall revise the plans as follows or provide the additional specified documentation:
a. Provide a double left-turn lane along southbound/ westbound Riggs Road (MD 212) at the approach to Adelphi Road or such other modification approved by DPW&T and SHA.
b. The following shall be added as a note in the general notes of the comprehensive design plan:
"Total development within the subject property shall be limited to uses which generate no more than 23 AM and 268

(Continued…)

(…continued)

MP peak-hour vehicle trips. Any development generating an impact greater than this amount shall require an amended comprehensive design plan with a new determination of the adequacy of transportation facilities."

c. The plans shall clearly indicate that access to the site shall be limited to a right-in/right-out access on Adelphi Road and to a full movement intersection on Riggs Road (MD 212) opposite Metzerott Plaza and revised to replace the grey arrows with blue, indicating only pedestrian access to Edwards Way.

d. Indicate clearly on the comprehensive design plan a dedication of 35 feet from the centerline of Riggs Road (MD 212), and 50 feet from the centerline of Adelphi Road as required by Basic Plan A-9964-C.

e. Procure from DPW&T a written statement that the subject project is in conformance with the requirements of the approved stormwater management concept or its revisions, should the applicant be required by DPW&T to revise the concept. Such statement shall be submitted to the Urban Design Section as designee of the Planning Board.

f. Additional trash receptacles shall be added to the site and provided interior to the site and along all street frontages. Final design of this additional pedestrian streetscape element shall be approved by the Urban Design Section as designee of the Planning Board.

g. A note shall be added to the plans stating that the trash receptacles and the dumpster shall be emptied as needed; that the site and its landscaping shall be regularly maintained; and that all dust free surfaces shall be washed and swept as needed.

h. Perennial and annual flowering plants shall augment the offerings of the landscape plan. Final design of such additional landscaping shall be approved by the Urban Design Section as designee of the Planning Board.

2. Prior to the issuance of the first building permit within the subject property, the following transportation improvements shall (a) have full financial assurances, (b) have been permitted for construction through the operating agency's access permit process, and (c) have an agreed on time table for construction with the appropriate operating agency.

(Continued…)

(…continued)

    a. Complete a traffic queuing analysis for SHA at the proposed site access point on Riggs Road (MD 212) and any improvements required by the Maryland State Highway Administration (SHA), at this location.

    b. Double left-turn lanes on the southbound/westbound approach of Riggs Road (MD 212) at Adelphi Road, together with any associated pavement markings, signage, traffic signal modifications, or similar items necessary at this location, as determined by the Maryland State Highway Administration (SHA).

    c. An acceptable traffic signal warrant study to the Maryland State Highway Administration (SHA) for signalization at the intersection of Riggs Road (MD 212) and Edwards Way and any signal or other traffic control improvements that are deemed warranted at that time. The applicant shall utilize a new 12-hour count, and shall analyze signal warrants under total future traffic as well as existing traffic at the direction of the responsible operating agency.

3. Prior to approval of the first specific design plan for the subject property, the applicant shall:

    a. Submit an acceptable traffic signal warrant study to the Department of Public Works and Transportation (DPW&T) for signalization at the intersection of Adelphi Road and Edwards Way. The applicant shall utilize a new 12-hour count, and shall analyze signal warrants under total future traffic as well as existing traffic at the direction of the responsible operating agency. If any signal or other traffic control improvements is/are deeded warranted by the signal traffic warrant for signalization at the intersection of Adelphi Road and Edwards Way, the applicant shall bond the signal with the appropriate agency prior to the release of any building permits within the subject property, and install it at the time when directed by the agency.

    b. Proffer detailed dimensional color drawings to scale, including all materials describing the exact construction of all street scape and focal point amenities, including but not limited to the "Welcome to Adelphi" sign, all types of walls to be utilized around the periphery of the site and in the focal point, benches, trash receptacles, bike racks, and

(Continued…)

50

decorative light fixtures. The location of all such details and amenities shall be indicated on the specific design plan.

c. Provide a detailed landscape plan including trees, shrubs and annual and perennial flowers creating a diversity of seasonal interest and a vegetative buffer along Edwards Way.

d. Provide through analysis of all specimen trees whose [sic] removal have been approved by the companion variance to CDP-1001 to determine if preservation of any of the specimen trees can be achieved through adjustment of grading, use of retaining walls or other measures.

4. At the time of approval of the preliminary plan for the project:

a. The applicant shall show a dedication of 35 feet from the centerline of Edwards Way.

b. Timing of the required installation of a double left-turn lane along southbound/westbound Riggs Road (MD 212) at the approach to Adelphi Road.

The Planning Board's approval of SDP-1001 was subject to the following additional conditions:

1. Prior to the signature approval of the plans, the applicant shall make the following revisions and provide the indicated additional documentation:

a. The sign detail shall be revised for the proposed tenants, exclusive of CVS, to include sign dimensions, materials, and up to four colors. The signage colors and logos of regional or national tenant shall be allowed as a substitute for the detail provided in the revisions.

b. The parking schedule shall be revised to clarify the number of spaces provided in the parking breakdown and the number of spaces.

c. The relevant comprehensive design plan and the preliminary plan of subdivision shall be certified in accordance with the requirements of the respective approvals.

d. A note shall be placed on the plans stating that: "Trash receptacles and the dumpster shall be emptied as needed and

(Continued…)

(…continued)

the site and its landscaping shall be regularly maintained. All dust free surfaces shall be washed and swept as needed."

e. Perennial and annual flowering plants shall be added to the landscaping plan. Final design of such additional landscaping shall be approved by the Urban Design Section as designee of the Planning Board.

f. The applicant shall provide a written statement from the Department of Public Works and Transportation (DPW&T) stating that they found the traffic signal warrant evaluation for the intersection of Adelphi Road and Edwards Way submitted by the applicant's traffic engineer to be acceptable.

g. Items required by Condition 1 of CDP-1001, prior to signature approval, shall be adequately reflected on the SDP. The access to Adelphi Road shall be clearly labeled as right-in/right-out access. Final conformance to these requirements on the SDP shall be approved by the Urban Design Section as designee of the Planning Board.

h. The applicant shall include dimensional color drawings to scale of all streetscape and focal point amenities, including but not limited to the "Welcome to Adelphi" sign, all types of walls to be utilized to be utilized around the periphery of the site and in the focal point, benches, trash receptacles, bike racks, and decorative light fixtures. Streetscape treatments shall be as follows:

- "Streetscape A" shall include three benches within the area of the focal point "Welcome to Adelphi" feature, a decorative two-foot knee wall including masonry piers (three feet high, spaced about 17 feet apart, and a linear hedge with perennial plantings and other shrubs, ornamental grasses and ground cover. This design shall be provided on both sides of the community focal feature at the intersection of Riggs and Adelphi Roads (MD 212) to the vehicular entrance to the project, and along Adelphi Road for approximately the same distance.

  - "Streetscape B" shall include a decorative fence with masonry piers (four feet high), approximately 17 feet apart, linear hedge and perennial plantings. It shall be utilized along the portion of the Adelphi Road frontage staring where Streetscape A ends, then along Adelphi Road

(Continued…)

extending to the intersection at Edwards Way; and along Riggs Road form the western side of its vehicular entrance to its intersection with Edwards Way

- "Streetscape C" shall include a vegetated buffer including deciduous and evergreen trees to create diversity of seasonal interest and annual and perennial flowers as required by Condition 3c of the CDP approval. Streetscape C shall be utilized along the project's Edwards Way frontage and on the adjacent Adelphi Road frontage, in a southern direction, to the vehicular entranceway from Adelphi Road.

Streetscape design shall include, in addition to any required DPW&T street lights, twelve decorative pedestrian-scale light fixtures (four along Adelphi Road, four along the Edwards Way frontage, and four along the Riggs Road frontage), a total of five benches (three at the corner of Adelphi and Riggs Roads as part of the focal feature area, and one at each of the two bus stops (one on the Riggs Road frontage and one on the Adelphi Road frontage).

Final design of all streetscape treatments shall be consistent with Applicant's Exhibit B and approved by the Urban Design Section as designee of the Planning Board.

i. The applicant shall provide striped crosswalks across Edwards Way at both the intersection of Riggs and Adelphi Roads unless otherwise modified by DPW&T and SHA.

j. A copy of the stormwater management concept shall be submitted for inclusion in the case file, and the approved Stormwater Management Concept Plan (2925-2002-02) shall be correctly reflected on the specific design plan and Type 2 tree conservation plan.

k. The applicant shall revise the specific design plan to clearly indicate with notes and labels that the connection between the two buildings is a false façade that runs from the ground to the roof on both the Edwards Way and Adelphi Road frontages.

l. The Type 2 tree conservation plan shall be revised as follows:

(1) Show a threshold calculation of 20 percent on the worksheet, in conformance with the approved Type 1 tree conservation plan.

(Continued…)

No party to the Planning Board proceedings appealed. The District Council elected, however, to review the Planning Board's approval of the CDP and SDP, pursuant to PGCC § 27-523(a) and § 27-528.01(b). On 7 November 2011, the District Council held a public hearing and entertained oral arguments.[53] Seven days later, the District Council remanded CDP-1001 and SDP-1001 to the Planning Board to consider three specific areas of concern: (1) whether the lack of a community center and the destruction of the natural tree canopy could be mitigated through amenities benefiting the surrounding community; (2) whether the deforestation mitigation plans were adequate; and, (3) whether access for the nearby residents of Edwards Way could be improved to compensate for the increase in traffic resulting from the proposed development.

On 9 February 2012, and after its technical staff pondered the District Council's three areas of apparent concern, the Planning Board held a hearing to consider the

<hr>

(…continued)
> (2) Add the following note: "The first priority for any approved off-site woodland conservation shall be within the Anacostia Watershed."
> m. The tree canopy coverage worksheet demonstrating how the tree canopy coverage will be met shall be shown on the landscape plan.

We are not able to append to this opinion legible copies of the graphic development plans for CDP-1001 or SDP-1001, which would aid a reader in appreciating better some of the references in these conditions. For that, as well as the length of this opinion, we are sorry.

[53] The documents in the record before us do not contain a transcript of this hearing. Nevertheless, the District Council describes in its Order of Remand that at the hearing "opposition parties raised considerable objection, much of it well founded, as to the applicant's desire to completely clear the tree canopy . . . from the subject property."

specific issues identified in the District Council's remand. Four weeks after that hearing, the Planning Board issued amended resolutions, delineating additional findings and again approving CDP-1001 and SDP-1001, subject to substantially the same conditions.[54]

The Planning Board addressed each of the issues for which the District Council remanded the application. With respect to the lack of a community center, the Planning Board noted that the Edwards Property was of insufficient size for the construction of a community center. The Planning Board noted that, in the L-A-C zone, a "community center" is not justified unless the tract comprises twenty adjoining acres, and a "village center" requires ten adjoining acres.[55] The Planning Board did require additionally Zimmer to provide a sculpture to the previously planned mini-park on the site and to include in its landscape plan flowering plants that were drought-resistant. With respect to the environmental concerns, the Planning Board explained how it arrived at its determination that none of the trees on the rather small lot could be retained and why the proposed mitigation for their loss was adequate. Finally, the Planning Board described its re-analysis of the traffic impacts on Edwards Way vis-à-vis the proposed development and the neighborhood, concluding that "[t]he installation of a [traffic] signal at Adelphi Road and Edwards Way will greatly reduce delay for traffic using Edwards Way, and should reduce any queuing that currently occurs" and that "[n]o changes to the previously

_____

[54] In its amended resolution, the Planning Board amended the conditions on its approval of SDP-1001, requiring that the perennial and annual flowering plants to be added to the landscape plan be drought-resistant and that the focal point feature "be further enhanced by a sculpture expressive of civic pride . . . ."

[55] These requirements for the L-A-C zone are found in PGCC § 27-496.

approved transportation-related conditions associated with the plan approval [were] warranted."

No party took an appeal, but the District Council elected again to review the Board's revised decisions regarding CDP-1001 and SDP-1001. On 21 May 2012, the District Council entertained oral arguments. A member of the Planning Board staff presented an overview of the proposed development and addressed the issues for which the District Council remanded the case to the Planning Board. The Planning Board staff member recommended approval of the CDP and SDP. The District Council had no questions for the staff member.

The attorney representing Zimmer was allowed thirty minutes to address the Council. On behalf of Zimmer, he concurred succinctly[56] with the Planning Board's assessment and stated that the conditions imposed by the Planning Board addressed the considerations remanded to the Planning Board. Although the attorney reserved the lion's share of his allowed time for questions from the District Council, none were forthcoming.

The opposition (although none had appealed to the District Council) were given thirty minutes to speak. Two persons took the podium. A member of the Adelphi community and also of an ad hoc civic group "People United for Fairness" spoke. He argued that CDP-1001 should be denied because: (1) the property could be better used as a community meeting place (or potentially as a park); (2) the clearing of the woodlands would be damaging ecologically; (3) the runoff from the property and the general effect

---

[56] Counsel spoke one-hundred and sixteen words in his direct remarks.

on the water table would damage nearby properties; (4) the development would endanger pedestrians; and, (5) response times for emergency vehicles would be compromised as a result of increased traffic. He questioned also the level of community involvement in the planning of the development.

The President of the Board of the Racquet Club Condominium, a property directly across Edwards Way from the proposed development, spoke in opposition as well. Her concern was primarily that the truck traffic accessing the finished development and the placement of the traffic signal at the intersection of Adelphi Road and Edwards Way would disrupt existing traffic patterns. According to her remarks, driveways serving approximately 530 housing units with ingress and egress on Edwards Way, which road suffered already from congestion, would be affected adversely. She complained also that there was no outreach by Zimmer or its affiliates to the Racquet Club Condominium community in the planning of the development.

In rebuttal, Zimmer's attorney highlighted the ways in which the community had been involved (or invited to be involved) in the planning process, including his direct contact with the President of the Board of the Racquet Club Condominium.

The People's Zoning Counsel[57] spoke last. He stated that the case had "been reviewed exhaustedly by the community" and concurred with the Planning Board actions.

---

[57] This position was created in 1970 by Article VII ("Planning and Zoning"), Section 712 ("People's Zoning Counsel" or "People's Counsel"), of the Prince George's County Charter, which provides that the County Executive shall appoint one or more Maryland attorneys to "appear at all hearings on zoning cases, whether before the Council or a hearing examiner, for the purposes of protecting the public interest and

(Continued…)

At the close of the hearing, the Council member, in whose district the subject property lay, remarked: "I think that this zone on this property, L-A-C, one of the main features of an L-A-C zone is supposed to be some tangible community benefit. And other than really a welcome sign, there isn't anything significant, you know, for this community." That Council member moved then for an Order of Denial, which motion was seconded. There being little discussion, the District Council Chair called for a vote. The vote was 9-0 to deny the CDP and SDP and to have its staff prepare an order of denial.

The staff of the District Council generated the Order of Denial, with an attached memorandum explaining its conception of reasons for the proposed denial. The memorandum marshalled fourteen reasons. According to the memorandum, CDP-1001 and SDP-1001, as approved by the Planning Board, failed to meet several conditions of

(…continued)
insuring the compilation of a full and complete record." *See* PGCC § 27-136 ("An independent People's [Zoning] Counsel can protect the public interest and promote a full and fair representation of relevant issues in administrative proceedings in order to achieve balanced records upon which sound land use decisions can be made. In addition, a People's [Zoning] Counsel who provides technical assistance to citizens and citizen organizations will encourage effective participation in, and increase public understanding of and confidence in, the County land use process."); *see also* PGCC § 27-137 (discussing the appointment of the People's Zoning Counsel). Section 712 of the Charter provides that People's Zoning Counsel may summon, examine, and cross-examine witnesses, introduce documentary evidence into the record, file exceptions, and make any argument to the hearing examiner or Council as the law and evidence in the case may warrant. In certain limited circumstances, the People's Zoning Counsel may also petition for judicial review of certain land use actions on behalf of a bona fide citizens association. *See* LU § 25-206. In practice, appearance of People's Counsel before the District Council has not been limited necessarily to just rezoning cases, but rather more broadly also to land use cases generally, e.g., special exceptions, CDPs, and SDPs.

the 2004 zoning map amendment,[58] fell below the minimum floor area ratio (FAR) for retail commercial development in a parcel zoned L-A-C,[59] and did not justify adequately the failure to include a community center in its development.[60] The District Council, on 21 June 2012, adopted as its own the Order of Denial and attached memorandum.

On 3 July 2012, Zimmer sought judicial review by the Circuit Court for Prince George's County of the District Council's denial of SDP-1001 and CDP-1001. In a

---

[58] According to the memorandum, CDP-1001 and SDP-1001 failed to satisfy: (a) Condition 1, requiring revision of the development's Basic Plan to show certain public rights-of-way; (b) Condition 2, requiring provision of a double-left turn lane along MD-212, with the timing of the improvement to be determined at the Preliminary Plan of Subdivision; (c) Condition 3, requiring submission to the County Department of Public Works and Transportation an acceptable traffic signal warrant study, prepared utilizing certain procedures; (d) Condition 4, requiring submission of a more detailed operational analysis of nearby intersections during the review of the Preliminary Plan of Subdivision; (e) Condition 7, requiring a woodland conservation threshold of twenty percent, with first priority for any proposed off-site mitigation being within the Anacostia Watershed; (f) Condition 8(A), requiring a distinctive architecture design for the development; (g) Condition 8(B), requiring consideration of a build-to line; (h) Condition 8(D), prohibiting massive surface facilities adjacent to Riggs Road and Adelphi Road; (i) Condition 8(E), requiring a green area at the intersection of Adelphi Road and Riggs Road, and the provision of an architectural focal point or sculpture therein; (j) Condition 8(F), requiring that no loading or dumpster areas be visible from adjacent roadways; (k) Condition 9(F), requiring the developer to work with transit authorities to maintain bus stops and to construct an additional bus pull-off area; and (l), Condition 10, requiring the developer to make its best efforts to include a restaurant as an ancillary tenant.

[59] The L-A-C zone establishes a "maximum" and a "base" level of commercial intensity to which any property so zoned may be used. PGCC § 27-496(a). The maximum commercial density of an L-A-C zoned property between four and ten acres is 0.31 FAR. PGCC § 27-496(a). The base commercial intensity for such a property is 0.16 FAR. PGCC § 27-496(a). Zimmer's proposed development depicted an FAR of 0.13.

[60] There was no express provision in the conditions of the 2004 rezoning, or in the PGCC applicable to L-A-C zones, obligating consideration of a community center on the Edwards Property.

written opinion, the Circuit Court held, among other things, that: (1) the District Council had appellate jurisdiction, not original jurisdiction, to review the determinations of the Planning Board and, hence, was limited to determining whether the Planning Board's decision was arbitrary, capricious, discriminatory, or illegal; (2) the District Council's review, under the circumstances, was limited further to the specific issues for which it remanded the case to the Planning Board; and, (3) the District Council substituted improperly its judgment for the judgment of the Planning Board, as there was substantial evidence supporting the Planning Board's determination on each of the remanded issues.[61] The Circuit Court reversed the decision of the District Council and remanded the case to the District Council, with directions to approve CDP-1001 and SDP-1001, as approved by the Planning Board.

The District Council appealed the judgment of the Circuit Court to the Court of Special Appeals ("CSA"). The intermediate appellate court affirmed. *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 217 Md. App. 310, 331, 92 A.3d 601, 614 (2014). That court held, *inter alia*, that: (1) the District Council was authorized to exercise only appellate jurisdiction to review the decisions of the Planning Board regarding SDP-1001 and CDP-1001, and, hence, was restricted to determining whether

---

[61] The Circuit Court concluded that each of the fourteen reasons the District Council presented for denial were either beyond the scope of the remand, were contradicted by substantial evidence presented to the Planning Board, or estopped by the District Council's 2014 approval of the Basic Plan. Only with respect to one of the reasons for denial (failure to meet the base commercial intensity in the L-A-C zone) did the Circuit Court not find substantial evidence in support of the Planning Board's decision. As to that issue, the Circuit Court based its holding reversing the District Council solely on the District Council not remanding that issue to the Planning Board.

60

the Planning Board decision was arbitrary, capricious, discriminatory, or illegal; (2) PGCC § 27–523(c) allowed for District Council review on the second call-up only of the remand issues; and, (3) the District Council's argument that each of its fourteen reasons for denying the applications was supported by substantial evidence was inapposite because only the remand issues were appropriate to consider and the District Council was authorized to reverse only arbitrary, capricious, discriminatory, or illegal decisions by the Planning Board. *Zimmer Dev.*, 217 Md. App. 318-31, 92 A.3d at 606-14.

The District Council sought our review of the case. We granted a writ of certiorari, *Prince George's Cnty. v. Zimmer Dev. Corp.*, 440 Md. 114, 99 A.3d 778 (2014), to consider the following questions:

> 1) Did the CSA err in its statutory construction of the "Regional District Act" ("RDA") by holding that the District Council is vested with appellate rather than original jurisdiction over Planning Board preliminary determinations with respect to regional and legislative zoning matters?
>
> 2) Did the CSA err by applying *County Council of Prince George's County v. Curtis Regency*, 121 Md. App. 123, [126, 708 A.2d 1058, 1059 (1998)], even though it involved a preliminary planning matter rather than a legislative, regional zoning matter which conflicts with this Court's holding in *County Council of Prince George's County v. Dutcher*, Prince George's County v. Dutcher, [365 Md. 399, 425, 780 A.2d 1137, 1152 (2001)]?
>
> 3) Whether the County Council's 1996 enactment of the County Code ("PGCC") § 27-132(f), providing that the District Council "shall exercise original jurisdiction" in its "review [of] a decision made by … the Planning Board," is consistent with the provisions of the RDA?
>
> 4) Whether the CSA's holding improperly transfers the legislative, regional zoning authority expressly provided to

61

the District Council by the RDA to the Planning Board, a subordinate agency?

5) Whether the CSA's holding violates the separation of powers doctrine because the judiciary has divested the legislative body of its legislative authority over regional zoning, including the applications related to zoning map amendments sought here, specifically designated by State law?

6) Whether the CSA nullified the District Council's statutory right to "remand" a case to the Planning Board for further information, and the District Council's obligation to issue a "final" decision prior to judicial review, by holding that the District Council is limited after remand to only those issues that were remanded?

7) Assuming, *arguendo*, that the CSA correctly held that the District Council's standard of review of the Planning Board's actions is the "arbitrary, capricious, discriminatory or illegal" standard, then whether the CSA erred by reinstating the Planning Board's recommendations as to Zimmer's applications, instead of remanding for the District Council to apply the correct standard of review?

### III. JUDICIAL STANDARD OF REVIEW

The questions posed in the District Council's petition for writ of certiorari may be condensed into three: (1) did the District Council have broad, original jurisdiction when considering the Planning Board's approvals of CDP-1001 and SDP-1001, or did it have only a more limited, appellate-like jurisdiction; (2) was the District Council's ultimate consideration of the Planning Board's approvals limited to the issues remanded to the Planning Board; and, (3) assuming the District Council reviewed the Planning Board's decision using an improper standard, should the case have been remanded to the District Council to apply the correct standard?

Each of these are legal questions, which we decide without deference to the judgments of the intermediate appellate court or Circuit Court. *Talbot Cnty. v. Miles Point Prop., LLC,* 415 Md. 372, 384, 2 A.3d 344, 351 (2010). "Accordingly, we 'look through the circuit court's and intermediate appellate court's decisions, although applying the same standards of review, and evaluate the decision of the agency." *Elms v. Renewal by Andersen*, 439 Md. 381, 391, 96 A.3d 175, 181 (2014) (quoting *Surina*, 400 Md. at 681, 929 A.2d at 910). We consider often the expertise of an administrative agency tasked with implementing statutes when determining whether its decision was premised on an erroneous conclusion of law. *Surina*, 400 Md. at 683, 929 A.2d at 911 (quoting *Marzullo v. Kahl*, 366 Md. 158, 173, 783 A.2d 169, 178 (2001)). When a case before us presents solely conclusions of law respecting jurisdiction, however, we do not afford deference to the legal conclusions of the agency. *Miles Point Prop.*, 415 Md. at 384, 2 A.3d at 351.

## IV. THE CDP AND SDP APPROVAL PROCESS IN THE RDA

As noted previously, Prince George's County's authority to regulate land use within the Regional District is delegated by the RDA. *E.g.*, *Ray's Used Cars*, 398 Md. at 646, 922 A.2d at 503; *Brandywine Enterprises*, 350 Md. at 342, 711 A.2d at 1347; *see also supra* note 30. The respective roles of the District Council and Planning Board in the CDP and SDP approval process depend on the provisions of the RDA regarding that process, both express and reasonably implied.

The requirement that a CDP and a SDP must be approved before physical development may begin in comprehensive design zones is a process by which planning

goals may be implemented. The RDA provides expressly for some methods to accomplish this task, but provides also a method by which additional functions not mentioned in the RDA may implement planning responsibilities. We look first to the methods provided for expressly.

## A. Zoning Map Amendments

The District Council asserts that CDP-1001 and SDP-1001 partake of the nature of zoning map amendments because they purport to carry out the approved Basic Plan. With respect to acting on zoning map amendments, the Planning Board provides only recommendations to the District Council. *See* LU §§ 22-208, 20-202(b).[62] The conclusion of the District Council's syllogism is, therefore, that the Planning Board's approval of CDP-1001 and SDP-1001 was merely a recommendation. The argument continues that, because the Planning Board's approval was a recommendation, and such a recommendation in the instance of a zoning process has no inherent legal weight, the District Council had original authority to decide differently the action to be taken regarding CDP-1001 and SDP-1001, without any deference owed or presumptive

---

[62] LU § 22-208(a) makes clear that referral to the Planning Board by the District Council of a pending piecemeal zoning map amendment is to receive advisory input only. It provides:

> Before a map amendment is approved, it shall by submitted to the appropriate county planning board and to the governing body of the municipal corporation or governed special taxing district where the land is located for a recommendation as to approval, disapproval, or approval with conditions.

LU § 22-208(a).

correctness accorded the Planning Board's determination. The form of the District Council's logic tracks, to a point—Planning Board decisions in Prince George's County regarding zoning map amendments are mere recommendations to the District Council—but falters with its first major premise.

CDP-1001 and SDP-1001 were not zoning map amendments, nor do they partake of the character of such. The act of rezoning the Edwards Property was completed in 2004 when the District Council approved the L-A-C zone and the Basic Plan for the proposed development by virtue of Zoning Ordinance 10-2004.[63] This ordinance was the legislative act establishing the rezoning. After the legislative act, the property was zoned L-A-C, subject to the conditions enumerated in Zoning Ordinance 10-2004.[64] The subsequent CDP and SDP steps required were to ensure that the development proposed for the Edwards Property addressed the planning implementation goals required for the

_____

[63] According to Section 3 of Zoning Ordinance 10-2004, the Ordinance was effective on the date of its enactment and the request for rezoning was "approved." The rezoning did not become effective, however, until the conditions were accepted in writing. Although we could not find in the record before us when the conditions were accepted, the only reasonable inference is that they were accepted because all documents relating to CDP-1001 and SDP-1001 state that the Edwards Property was zoned L-A-C and the conditions of Zoning Ordinance 10-2004 were applicable to the property. Furthermore, the District Council does not maintain to the contrary.

[64] LU § 22-214 authorizes conditional rezoning by the District Council. LU § 22-214(c) allows the applicant for rezoning "90 days from the date of approval to accept or reject the land use classification conditionally approved. If the applicant expressly rejects the amendment as conditionally approved within the 90-day period, the zoning classification shall revert to its prior status." The plain language of the statute indicates that the rezoning is complete upon the initial rezoning, but may *revert* potentially to the prior classification upon untimely action by the applicant to accept or rejection of the conditions.

specific comprehensive design zone involved. The CDP and SDP steps are designed as an increasingly more rigorous path to flesh-out the details and specifics of the proposed development. *See* PGCC §§ 27-518, 27-521, 27-527, 27-528.

Neither party here supplies an alternative theory explaining the source of authority within the RDA for the establishment of the requirements of the CDP and SDP processes. In an abundance of caution, we will consider other possible options in aid of our task to discover Legislative intent.

### B. Are They Processes to Raise Zoning Questions?

One possibility is that CDPs and SDPs operate as a process to raise zoning questions. LU § 20-503(a) states that "[b]y zoning law, a district council may provide for: (1) the issuance of use and occupancy permits; and (2) a process to raise a zoning question before the preparation of all structural specifications of a building or structure that may be required for a complete building permit." Although CDPs and SDPs are not "use and occupancy" permits, which are treated separately in the PGCC, *see* PGCC § 27-253, "a process to raise a zoning question" is broad and could encompass conceivably actions like CDP and SDP approval.[65]

---

[65] The pre-2012 codification of the RDA, in Md. Code, Art. 28, § 8-119(b), stated that "a district council may provide in its zoning regulations for the issuance of use and occupancy permits and for *certificates* by means of which zoning questions may be raised prior to the preparation of all structural specifications of a building as may be required for a complete building permit." (emphasis added).

LU § 20-503 does not describe expressly the authority of the District Council to review *de novo* Planning Board actions on CDPs and SDPs as part of a scheme to raise and resolve zoning questions. With regard to building permits, the statute provides:

> (a) *In general.* — By zoning law, a district council may provide for:
>   (1) the issuance of use and occupancy permits; and
>   (2) a process[66] to raise a zoning question before the preparation of all structural specifications of a building or structure that may be required for a complete building permit.
> (b) *Montgomery County.* — In Montgomery County, all building permit applications shall be referred to the Commission for review and recommendation as to zoning requirements.
> (c) *Prince George's County.* — In Prince George's County, the County Council, by local law, may provide for the referral of some or all building permit applications to the Commission for review and recommendation as to zoning requirements.

LU § 20-503.

Despite excluding the Planning Board from making final determinations as to the issuance of building permits, the RDA does not specify which agency has original jurisdiction over building permits or other elements of a process to raise zoning questions. LU § 20-513 grants to the District Council broad authority to impose and implement building codes, in part through permitting. The District Council is not limited expressly in its delegation or retention of the original jurisdiction to make these

---

[66] CDPs and SDPs are better described as a process rather than as a "certificate." Approval requires significant investigation and consideration, and if a related basic plan, CDP, and SDP are submitted separately, the result is an iterative series of actions to achieve the planning goals indicated by PGCC §§ 27-521, 27-528.

decisions.[67] *See* LU § 20-513(g) ("A building code adopted under this section shall be enforced by the officers designated in the county charter or county code.").[68]

Although categorizing CDPs and SDPs as a process contemplated by LU § 20-503 would provide a simple resolution to the present case, that is not a good fit with the permits and certificates contemplated by the section. The deciding agency wields narrower discretion regarding the issuance of building permits and use and occupancy permits. "[T]he issuance of building permits in respect to applications that fully comply with applicable ordinances and regulations of a particular subdivision is a ministerial act." *Evans v. Burruss*, 401 Md. 586, 605, 933 A.2d 872, 883 (2007). Use and occupancy permits are concerned primarily with discrete standards as well. *See* PGGC § 27-257 (stating that the issuance of a use and occupancy permit certifies that the building, structure, and use meet the requirements of Prince George's County's zoning ordinances); *Cowles v. Montgomery Cnty.*, 123 Md. App. 426, 439, 718 A.2d 678, 685 (1998) (describing the considerations of the Board of Appeals of Montgomery County regarding a use and occupancy permit). The review of a CDP and SDP, on the other hand, requires planning expertise and the exercise of a broad range of discretion. *See*

---

[67] LU § 22-311 requires that appeals from "the grant or refusal of a building permit or the grant or withholding of an occupancy or use permit or any other administrative decision based or claimed to be based in whole or in part upon any zoning regulation or map enacted by the district council of that county" be heard by the board of appeals.

[68] The Prince George's County Charter Article XII, section 17, designates as responsible for administration and enforcement of building permits the Director of the Department of Permitting, Inspections, and Enforcement. The Department of Permitting, Inspections, and Enforcement also issues use and occupancy permits. *See, e.g.*, PGCC §§ 4-349, 4-118, 11-202. This Department is an executive-branch agency in the County.

*supra* at Part I.F. In addition, applications for (and issuance of) building permits and use & occupancy certificates would follow approval of a CDP and SDP in the development process.

More to the heart of the matter, zoning compliance is not at the heart of the CDP and SDP approval process. Although compliance with zoning is one element the agency making the decision must find to approve a CDP or SDP, it must decide also many more quintessential planning matters. *See supra* at Part I.F. The focus of the CDP and SDP process is the development of a community, including the civic beauty, local infrastructure, and environmental concerns. *See* §§ PGCC 27-521, 27-27-528. The purpose of the process is to "result in a development with a better environment than could be achieved under other regulations[,]" PGCC § 27-521(a)(2), not a development that complies only with zoning and other land use regulation. Thus, LU § 20-503(a) may be eliminated as a "magic bullet" for the resolution of the present controversy.

**C. Is There an Apt Analogy to be Made to the Detailed Site Plan Process?**

In many ways, CDPs and SDPs are similar in the Prince George's County land development processes to Detailed Site Plans.[69] Detailed Site Plans are required for

---

[69] Actually, CDPs are closer in the level of detail required to be submitted to Conceptual Site Plans. A SDP is a closer cousin to a Detailed Site Plan. A Conceptual Site Plan must include:

> (1) Location map, north arrow, and scale;
> (2) Boundaries of the property, using bearings and distances (in feet) around the periphery;
> (3) Zoning categories of the subject property and all adjacent properties;

(Continued…)

(…continued)

(4) General locations and types of major improvements that are within fifty (50) feet of the subject property, and a general description of all land uses on adjacent properties;

(5) Existing topography, at not more than two (2) foot contour intervals;

(6) An approved Natural Resource Inventory (NRI);

(7) Street names, right-of-way and pavement widths of existing streets and interchanges within and adjacent to the site; and

(8) Existing rights-of-way and easements (such as railroad, utility, water, sewer, access, and storm drainage);

(9) Existing site and environmental features as shown on the approved NRI;

(10) A Type 1 Tree Conservation Plan prepared in conformance with Division 2 of Subtitle 25 and the Woodland and Wildlife Habitat Conservation Technical Manual or a Standard Letter of Exemption;

(11) Proposed system of internal streets, including right-of-way widths;

(12) Proposed lot lines and the land use proposed for each lot;

(13) General locations of areas of the site where buildings and parking lots are proposed to be located, and the general orientation of buildings on individual lots; and

(14) A stormwater concept plan approved or submitted for review pursuant to Section 4-322 of this Code;

(15) A statement of justification describing how the proposed design preserves and restores the regulated environmental features to the fullest extent possible.

PGCC § 27-273(e). A Conceptual Site Plan includes more detail than a Basic Plan in a floating zone, *compare* PGCC § 27-273(e), *with* PGCC § 27-195 (quoted *supra* note 40), and its contents overlap significantly with those of CDPs, *compare* PGCC § 27-273(e), *with* PGCC § 27-518(b) (quoted *supra* note 42). Conceptual Site Plans, however, are not mentioned expressly in the RDA. Senate Bill 901 of 2011, the act authorizing expressly and delineating authority to review Detailed Site Plans, was amended to limit its coverage to only "detailed" site plans (not all site plans generically) the application of the statute. 2011 Md. Laws ch. 90 (indicating that Senate Bill 901 was amended to refer to "detailed site plans" instead of "site plans").

(Continued…)

"certain types of land development [that] are best regulated by a combination of development standards and a discretionary review . . . ." PGCC § 27-281. Where required, Detailed Site Plans generally must be approved before a final plat of subdivision[70] or grading, building, or use of occupancy permits may be approved or issued. PGCC § 27-270 (specifying order of approvals); *see also* PGCC § 27-281.01 (stating generally the circumstances under which a Detailed Site Plan must be approved before permits are issued). The general purposes of Detailed Site Plans are:

> (A) To provide for development in accordance with the principles for the orderly, planned, efficient and economical development contained in the General Plan, Master Plan, or other approved plan;
> (B) To help fulfill the purposes of the zone in which the land is located;
> (C) To provide for development in accordance with the site design guidelines established in this Division; and
> (D) To provide approval procedures that are easy to understand and consistent for all types of Detailed Site Plans.

PGCC § 27-281(b)(2). These are planning considerations, like those underlying the process for the approval of CDPs and SDPs. The required content of a Detailed Site Plan is most similar to that of an SDP. *Compare* PGCC § 27-282 (indicating the content

---

(…continued)
The CDP and SDP are steps in a unitary process. The present case does not require us to determine whether Conceptual Site Plans, as provided for in the PGCC, are part of the Detailed Site Plan review process, when both are required in a specific instance.

[70] The final plat of subdivision may be approved before a Detailed Site Plan, if the Planning Board's technical staff determines that the site plan approval will not affect final plat approval. *See* PGCC § 27-270.

required in a Detailed Site Plan),[71] *with* PGCC § 27-527 (quoted *supra* note 44) (indicating the content required in an SDP). In a generic sense, CDPs and SDPs are glorified site plans.[72]

---

[71] Except where modified specifically, *see* PGCC §§ 27-281(f), 27-286(a), a Detailed Site Plan must include:

> (1) Location map, north arrow, and scale;
> (2) Boundaries of the property, using bearings and distances (in feet); and either the subdivision lot and block, or liber and folio numbers;
> (3) Zoning categories of the subject property and all adjacent properties;
> (4) Locations and types of major improvements that are within fifty (50) feet of the subject property and all land uses on adjacent properties;
> (5) An approved Natural Resource Inventory;
> (6) Street names, right-of-way and pavement widths of existing streets and interchanges within and adjacent to the site;
> (7) Existing rights-of-way and easements (such as railroad, utility, water, sewer, access, and storm drainage);
> (8) Existing site and environmental features as shown on an approved NRI;
> (9) A Type 2 Tree Conservation Plan prepared in conformance with Division 2 of Subtitle 25 and The Woodland and Wildlife Habitat Conservation Technical Manual or a Standard Letter of Exemption;
> (10) A statement of justification describing how the proposed design preserves and restores the regulated environmental features to the fullest extent possible;
> (11) An approved stormwater management concept plan;
> (12) Proposed system of internal streets including right-of-way widths;
> (13) Proposed lot lines and the dimensions (including bearings and distances, in feet) and the area of each lot;
> (14) Exact location and size of all buildings, structures, sidewalks, paved areas, parking lots (including striping) and

(Continued…)

(…continued)
designation of waste collection storage areas and the use of all buildings, structures, and land;

(15) Proposed grading, using one (1) or two (2) foot contour intervals, and any spot elevations that are necessary to describe high and low points, steps, retaining wall heights, and swales;

(16) A landscape plan prepared in accordance with the provisions of the Landscape Manual showing the exact location and description of all plants and other landscaping materials, including size (at time of planting), spacing, botanical and common names (including description of any plants that are not typical of the species), and planting method;

(17) Exact location, size, type, and layout of all recreation facilities;

(18) Exact location and type of such accessory facilities as paths, walks, walls, fences (including widths or height, as appropriate), entrance features, and gateway signs (in accordance with Section 27-626 of this Subtitle);

(19) A detailed statement indicating the manner in which any land intended for public use, but not proposed to be in public ownership, will be held, owned, and maintained for the indicated purpose (including any proposed covenants or other documents);

(20) Description of the physical appearance of proposed buildings (where specifically required), through the use of architectural elevations of facades (seen from public areas), or through other illustrative drawings, photographs, or renderings deemed appropriate by the Planning Board; and

(21) Any other pertinent information.

PGCC § 27-282(e).

[72] An SDP must include "[a] reproducible site plan showing buildings, functional use areas, circulation, and relationships between them . . . ." PGCC § 27-527(b)(1).

The approval process regarding Detailed Design Plans under LU § 25-210[73] is similar to the process the District Council argues applies here to CDPs and SDPs. The District Council is authorized expressly to "review a final decision of the county planning board to approve or disapprove a detailed site plan." LU § 25-210(a). Parties of record before the District Council may appeal to the District Council a decision of the Planning Board, or the District Council may review the decisions on its initiative. LU § 25-210(a). The District Council's determination after review is "a final decision." LU § 25-210(d).

LU § 25-210 does not prescribe, however, the standard of review by which the District Council considers decisions of the Planning Board (nor did Art. 28, § 8-129) regarding Detailed Site Plans. The District Council's review results in a "final decision," according to LU § 25-210(d), but LU § 25-210(a) labels also the decision of the Planning Board as "a final decision."[74]

Despite their similarities, key differences exist between the CDP and SDP process and the Detailed Site Plan process. A Detailed Site Plan is required to demonstrate that its design "represents a reasonable alternative for satisfying the site design guidelines, without requiring unreasonable costs and without detracting substantially from the utility of the proposed development for its intended use." PGCC § 27-285(a)(1). It is a method of moderating design guidelines so as to allow for greater variety of development, while

---

[73] LU § 25-210 applies only to Prince George's County, as did its prior codification, Art. 28, § 8-129.

[74] It is noteworthy that, unlike with respect to zoning map amendments, the RDA does not refer (either as contained in the Land Use Article or Article 28) to Planning Board determinations regarding Detailed Site Plans as "recommendations."

still achieving the goals of the guidelines. The CDP and SDP process, in contrast, is a broader implementation of planning considerations, aimed at producing "a better environment than could be achieved under other regulations . . . ." PGCC § 27-521(a)(2). In the final analysis, CDPs and SDPs are not Detailed Site Plans by another name.

The PGCC's treatment is determinative because the CDP and SDP process and the Detailed Site Plan process were in existence when the Legislature enacted Senate Bill 901 of 2011, which was codified as Art. 28, § 8-129 and re-codified in LU § 25-210.[75] The intent of the Legislature was to regulate Detailed Site Plans as that term was used in Prince George's County in 2011. If the Legislature intended CDPs and SDPs to be regulated similarly and under the same statute, we must assume that it would have done so expressly.

### D. Enforcement of Conditional Zoning

As noted earlier, the RDA has authorized since 1968 Prince George's County to engage in conditional rezoning. *See* Art. 28., § 8-104(e)(1) (re-codified as LU § 22-214).[76] The RDA provides also for the District Council to "adopt local laws necessary to

---

[75] Senate Bill 901 was introduced and enacted in 2011. 2011 Md. Laws ch. 90. In 1990, the earliest year for which relevant Prince George's County legislative history materials are available readily, County Bill 84 of that year amended portions of the PGCC relating to Detailed Site Plans and CDPs and SDPs as distinct processes.

[76] LU § 22-214(a) provides:

> In general.—In approving any zoning map amendment, the district council may consider and adopt any reasonable requirements, safeguards, and conditions that:

(Continued…)

75

provide adequate notice, public hearings, and enforcement procedures for the implementation [of such authority.]" LU § 22-214. Although the RDA provides expressly for the District Council to adopt the local laws to implement conditional zoning, it is silent regarding the District Council's authority to review the actions of an agency to which is delegated execution of the enforcement procedures the Council creates. *See* LU § 22-214.

Conditional zoning, when used to impose requirements related to design, layout, siting, appearance, and landscaping (as opposed to the *uses* of the land) is related closely to planning.[77] *See supra* at Part I.C.4. The majority of the conditions applied to the approval of the L-A-C zone and the Basic Plan for the Edwards Property involved planning considerations. Eleven of the conditions on the property were related to traffic impact alleviation, accommodation of mass transit, and the procurement of such. Eight concerned design, architecture, or landscaping. Others required certain streetscape infrastructure, efforts at crime reduction, woodland conservation, storm-water management, and the inclusion of civic groups in the design process. Only two conditions involved solely the commercial land uses to be developed on the property, which limited

_____

(…continued)
> (1) may be necessary to protect the surrounding properties from adverse effects that might accrue from the zoning map amendment; or
> (2) would further enhance the coordinated, harmonious, and systematic development of the regional district.

[77] LU § 22-214(a)(2) allows for the conditions applied to the rezoning to include planning considerations such as encouraging "the coordinated, harmonious, and systematic development . . . ."

commercial development to 40,000 square feet and required the developer to make its "best efforts" to include a restaurant as an ancillary tenant on the property.

The CDP and SDP processes may be used as a tool to realize the planning goals of conditional zoning and to guide the design of the proposed development, especially when the conditions refer to matters that must be addressed coincidentally through the legislative requirements of the CDP and SDP processes. It appears that CDP-1001 and SDP-1001 were used as such with regard to the Edwards Property. Most of the justifications offered by the District Council for denying CDP-1001 and SDP-1001 involved perceived failures to address adequately conditions imposed on the Edwards Property during the rezoning. *See supra* note 58.

Were it used only to consider and implement the conditions imposed on the piecemeal rezoning, perhaps the CDP and SDP review and approval processes could be seen as extensions of the District Council's "enforcement procedures for the implementation of" its conditional zoning, as provided for by LU § 22-214(e). Guiding development to comply with conditional zoning requirements could be termed "enforcement,"[78] and the CDP and SDP approval processes could be termed a

---

[78] At the time of the re-codification of Art. 28, § 8-104(e) as LU § 22-214, Black's Law Dictionary defined "enforcement" as "[t]he act or process of compelling compliance with a law, mandate, command, decree, or agreement." *Enforcement*, Black's Law Dictionary (9th ed. 2009); *see also Enforce*, Black's Law Dictionary (9th ed. 2009) (defining "enforce" as "[t]o give force or effect to (a law, etc.)").

"procedure."[79] Under the PGCC, however, the CDP and SDP processes do much more than implement conditional zoning. It implements planning considerations to achieve a better development than would otherwise be achievable. *See* PGCC § 27-521(a).

The CDP and SDP processes would be necessary even if the District Council, upon approving a piecemeal rezoning, attached no conditions on a rezoning. The developer would need still to satisfy the legislative findings set out in PGGC § 27-521 for the CDP and PGCC § 27-528 for the SDP.

CDP-1001 and SDP-1001 provide useful illustration of how the CDP and SDP processes extend more proportionately to matters outside the potential reach of conditional zoning. The District Council justified its denial of CDP-1001 and SDP-1001, in part, on the failure to consider adequately a community center. None of the conditions or express requirements of the PGCC require a community center in every development of L-A-C zoned property, but the District Council recognized correctly that the CDP and SDP processes involve more than implementing static zoning requirements and the conditions imposed on the property's rezoning, or achieving uniformity throughout the district. It implements the planning purposes of the comprehensive design zone at issue.

### E. Assignment of Other Functions

LU § 20-207 provides a method by which functions that are not assigned otherwise in the RDA may be implemented in the Regional District and by which local

---

[79] At the time of the re-codification of Art. 28, § 8-104(e) as LU § 22-214, Black's Law Dictionary defined "procedure" as "[a] specific method or course of action." *Procedure*, Black's Law Dictionary (9th ed. 2009).

governmental body. According to the statute, "functions not specifically allocated in this subtitle shall be assigned to the Commission or to one or both of the county planning boards, as needed." LU § 20-207(a). Because no provision of the RDA deals expressly with CDPs or SDPs, and the similar or related land use actions that are detailed expressly by the RDA do not perform identical or sufficiently similar functions as the CDP and SDP approval processes, LU § 20-207 is a source of authority in the RDA by which a role in the CDP and SDP approval processes may be seen as delegated to the Planning Board.[80, 81]

LU § 20-207 imposes two requirements on the allocation of "additional functions." First, the assignments must be approved by the District Council and by the MNCPPC. LU § 22-207(b)(1). The District Council has provided its approval, as demonstrated by PGCC §§ 27-522 and 27-528, which authorize initial consideration by the Planning Board.[82] The MNCPPC appears to have accepted the assignment, as the

---

[80] LU § 20-207 provides authority also for the assignment to the Planning Board of any function, other than those provided for expressly by the RDA (e.g., recommendations regarding zoning map amendments according to LU § 22-208).

[81] The RDA authorizes implicitly the creation of processes like the CDP and SDP approval processes in LU § 22-104, which allows for the creation of zones, including presumably zones that, like comprehensive design zones in Prince George's County, allow for implementation of planning in a direct way. The structure of the RDA suggests further that original jurisdiction to implement such a scheme lies with the Planning Board. *But cf. infra* at Part V.

[82] In County Bill 76 of 1996, the District Council amended PGCC § 27-132(f)(1) purporting to give itself original jurisdiction over appeals from the Zoning Hearing Examiner and the Planning Board, according to the language of the ordinance. The District Council had assigned previously the initial consideration of CDPs and SDPs to

(Continued…)

Planning Board considers, in practice, CDPs and SDPs.[83] Assignment to the Planning Board of additional functions must also "carry out the policy that local or intracounty planning functions should be performed by the county planning boards." LU § 20-207(b)(2). Performance by the Planning Board of a plan implementation process carries out undoubtedly that policy.

## V. ORIGINAL AUTHORITY TO APPROVE OR DENY CDPS AND SDPS

As we described *supra* at Part I.E, the RDA grants to the Planning Board and to the District Council certain powers. LU § 20-202(b)(i) provides that the county planning boards have "exclusive jurisdiction" over "local functions," but does not detail each of the local functions within each jurisdiction.[84, 85] These functions may include any local

---

(…continued)
the Planning Board. The purpose of CB-76-1996, however, was not to revoke its delegation of initial consideration to the Planning Board, but rather to "clarify[] that all appeals to the District Council are an exercise of original jurisdiction." The District Council's intention was to set its jurisdiction vis-à-vis that of the Planning Board. We shall comment more on this later.

[83] Neither party argues that the Planning Board is not authorized to consider the approval of CDPs and SDPs in some manner.

[84] In full, LU § 20-202(b) provides:

> *Exclusive jurisdiction.* — (1) A county planning board has exclusive jurisdiction over:
> (i) Local functions, including:
>     1. the administration of subdivision regulations;
>     2. the preparation and adoption of recommendations to the district council with respect to zoning map amendments; and
>     3. the assignment of street names and house numbers in the regional district; and

(Continued…)

> (ii) mandatory referrals made in accordance with Subtitle 3, Part I of this title by the County Board of Education, a municipal corporation or special taxing district, or a publically owned or privately owned public utility.

The provision of "including" makes clear that the list was not exhaustive. The prior codification, Art. 28, § 7-111(a), stated that "[t]he local functions exclusively within the jurisdiction of the respective planning boards include, *but are not limited to*," the same functions. (emphasis added).

[85] The language granting the planning boards' exclusive jurisdiction over local functions was enacted by Chapter 780 of the Laws of Maryland of 1959. The context of the Act indicates that the jurisdiction of the planning boards was to be exclusive of the jurisdiction of the district councils, as well as exclusive of the Commission as a bi-county body.

Chapter 780 altered significantly the relationship between the Commission and the district councils. Before Chapter 780, the Commission was the primary land use actor within the Regional District. *See* 1943 Md. Laws ch. 992. The Commission created the plans, was authorized to acquire land and issue bonds, had final approval power over zoning, collaborated with its federal counterpart for the Washington, D.C., metropolitan area, and enacted and administered subdivision regulations. *See* 1943 Md. Laws ch. 992. The district councils enacted the zoning ordinances in their respective counties (subject to approval of the Commission) and were empowered to issue building permits and other building regulations. 1943 Md. Laws ch. 992.

Chapter 780 expanded the authority to regulate land use within the Regional District and delegated locally that authority. In particular, the act created the planning boards as distinct entities and gave primary zoning authority to the district councils. Prior to the 1959 act, the district councils could only enact a zoning regulation or make a change to the official zoning map if such regulation or change was consistent with the Commission's plan or if the Commission approved the change. *See* 1943 Md. Laws 992. According to § 78 of Chapter 780, the Commission provided merely a recommendation regarding a district council's changes to its zoning laws or zoning map. The planning boards were entirely new. Along with the creation of the planning boards, Chapter 780 enacted the language which is now codified in LU § 20-207, allowing for assignment to the planning boards of additional local functions that were not otherwise provided for by the RDA. 1959 Md. Laws ch. 780, at § 66.

(Continued…)

matter related to planning, zoning, subdivision, or assignment of street names and house numbers. *See* LU § 20-202(a).[86] The functions delegated to the county planning boards pursuant to LU § 20-207 are among the unlisted local functions over which the planning boards have exclusive jurisdiction. The Legislature did not itemize expressly or exhaustively each such intended function, for apparent good reason.

---

(…continued)

The structure of the local delegation of land use authority effected by Chapter 780 is the same as is currently codified in the Land Use Article. Primary zoning authority was delegated to the District Council. Some express local functions were delegated to the planning boards, as was a method for assigning additional local functions as the desire arose. Because the functions delegated under the act were not (and additional assigned functions would not be presumably) zoning *qua* zoning, the Legislature's intention was likely that exclusive original jurisdiction over these functions would also rest with the planning boards and not the district councils. We are not aware of any surviving indication of legislative intent contrary to the general structure of Chapter 780.

[86] LU § 20-202(a) provides:

> *In general.* — (1) Subject to paragraph (2) of this subsection, a county planning board:
> (i) is responsible for planning, subdivision, and zoning functions that are primarily local in scope; and
> (ii) shall exercise, within the county planning boards jurisdiction, the following powers:
> 1. planning
> 2. zoning
> 3. subdivision
> 4. assignment of street names and house numbers; and
> 5. any related matter.
> (2) The functions under paragraph (1) of this subsection do not include the regional planning functions of the Commission relating to or affecting the regional district as a planning unit.

Functions are placed into a planning board's jurisdiction through express provisions of the RDA, or through assignment pursuant to LU § 20-207.

The RDA makes particular provision for the local functions that the Legislature did not intend to be within the planning boards' exclusive jurisdiction. LU § 20-503(c) authorizes the District Council to refer for advice only some or all building permits to the Maryland-National Capital Park & Planning Commission for review and recommendation as to zoning compliance. LU § 22-208 requires referral to the county planning boards of applications for zoning map amendments for a "recommendation." Although unclear on its face as to the standard of review, LU § 25-210 authorizes, in Prince George's County, the District Council to "review" the "final decision" of the Planning Board, and issue a "final decision."

CDP and SDP approvals were not among the local functions that the Legislature excepted from the planning boards' exclusive jurisdiction. Because no alternative provision was made, the RDA indicates to us that, like other unspecified local planning functions, the Planning Board is invested with exclusive original jurisdiction over the determination of CDPs and SDPs,[87] subject to appellate review by the District Council.

For the authority of the Planning Board to be "exclusive" or "original" with respect to the CDP and SDP approval processes, the Planning Board must be the *de novo* decision-maker regarding the merits of a CDP or an SDP. The District Council, if

---

[87] Some evidence of this may be inferred also from the handling of Senate Bill 564 in the 2015 legislative session. Senate Bill 564, as introduced originally, proposed to provide the District Council with original jurisdiction in its review of the decisions of the Planning Board. The language that would have granted the District Council original jurisdiction, however, was removed by amendment before passage. The Bill was signed by the Governor on 12 May 2015, without the language giving the District Council authority to review *de novo* the decisions of the Planning Board. 2015 Md. Laws ch. 365.

allowed to decide *de novo* whether a CDP or an SDP should be approved, violates the division of authority established by the RDA. A provision of the county ordinance, such as PGCC § 27-132(f), that purports to give the District Council (or any other body) the authority to decide, *de novo*, a local function related to planning, zoning, subdivision, or the assignment of street names and house numbers, is invalid. The District Council may not arrogate to itself original jurisdiction where the RDA places that responsibility elsewhere. Only the General Assembly, through amendment of the RDA, may accomplish that objective.

The PGCC purports to direct the District Council to engage in this prohibited *de novo* review. PGCC § 27-528(d), which governs the review by the District Council of Planning Board decisions regarding a CDP, requires the District Council to "make the same findings which are required to be made by the Planning Board" before approving the CDP. PGCC § 27-528.01 governs the District Council's review of SDP decisions, requiring the same procedures that are required in reviewing a CDP, including presumably that the District Council must make the same findings that were required to be made by the Planning Board. PGCC § 27-132(f) eliminates any doubt as to whether the District Council's range of discretion was desired to be substantively the same as that of the Planning Board, when considering the same issues. According to PGCC § 27-

132(f), "[i]n deciding an appeal to the District Council, or Council election to review a decision, the Council shall exercise original jurisdiction."[88]

To the extent that the provisions of the PGCC purport to give the District Council the ability to consider *de novo* the merits of Planning Board decisions regarding CDPs and SDPs, such provisions are invalid. Because, according to PGCC § 27-106, the provisions are severable, they are still enforceable to the extent that they do not conflict with the original jurisdiction of the Planning Board under the RDA.[89]

## VI. STANDARD BY WHICH THE DISTRICT COUNCIL MAY REVIEW PLANNING BOARD DECISIONS

The parties agree that the District Council has authority to exercise some level of review of the Planning Board's decisions regarding approval of CDPs and SDPs.[90] That

---

[88] The District Council does not claim that PGCC § 27-132(f) would supersede the RDA to the extent they conflict. Rather, according to the Bill Summary of Council Bill ("CB") 76-1996, which enacted the section in question, this provision was to "clarify what has always been assumed and has historically been the [District] Council's practice regarding jurisdiction of the [District] Council when hearing appeals." CB-76-1996, 1996 Leg. Sess. (Prince George's County Council 1996). We interpret the RDA otherwise. The custom of the District Council cannot trump the text and purpose of a statute. *See Dutcher*, 365 Md. at 427, 780 A.2d at 1154 (citing *Smith v. Higinbothom*, 187 Md. 115, 132–33, 48 A.2d 754, 763 (1946)).

[89] We have no doubt that, if the General Assembly disagrees with our reasoning as to the interpretation of the RDA, it will consider what it may have intended otherwise in the course of the next or a following legislative session.

[90] Our decision in *County Council of Prince George's County v. Dutcher*, *supra*, injects some question as to the ability of the District Council to review decisions of the Planning Board where not authorized explicitly by the RDA. In *Dutcher*, we held that the RDA, by its silence on the matter, did not authorize an appeal to the District Council of a Planning Board decision regarding a non-cluster preliminary plan of subdivision. 365 Md. at 425, 780 A.2d at 1152. The RDA provided for only appeals to the Circuit Court of

(Continued…)

authority would derive implicitly from the legislative powers granted to the District Council in the RDA.

Pursuant to the RDA, the district councils are authorized sometimes to establish procedures by which decisions are made, even though the review of content of the decision is outside their purview.[91] The MNCPPC, along with the constituent planning boards, are responsible for developing plans, but, under the RDA, the district councils establish the procedures through which the plans are developed, adopted, and applied. *See* LU § 21-201(a) ("This subtitle is intended to vest control over planning procedures in the district councils of Montgomery County and Prince George's County, to the extent that control is not inconsistent with this division."). Although delegation to the Planning Board of enforcement procedures to implement the District Council's conditional zoning authority would fall also under LU § 20-207, and hence be exclusively within the original jurisdiction of the Planning Board, the RDA provides specifically for the District Council to establish procedures in that regard. LU § 22-214(e).

---

(…continued)
final actions. We decline to expand the scope of our review here, however, and will assume, *arguendo*, that the District Council is authorized to consider appeals from the Planning Board's action.

[91] The district councils are given also authority to establish procedures where they have authority to make the underlying decision. For example, the district councils may determine the procedure for: (1) the issuance of building permits, LU § 20-503; (2) the consideration and execution of development rights and responsibilities agreements; (3) an agricultural easement plan, LU § 25-605; and, (4) the Planning Board recommendation on a zoning map amendment, LU § 22-208.

It does not violate the RDA for the District Council to establish procedures and processes by which the Planning Board approves or denies CDPs and SDPs. Establishing procedures to guide the consideration of administrative action is a legislative function, which the RDA grants to the district councils in most instances. Further, the ability to create and modify procedures may be inherent in the assignment of additional functions to the Planning Board.

Through its ability to establish procedure, the District Council may carve-out for itself a role in the CDP and SDP approval process by requiring that, upon appeal to the District Council or upon its election to hear a matter, the case be considered by the District Council before a decision may become final. If the District Council agrees with the Planning Board or remands for further consideration the CDP or SDP, it does not interfere with the original jurisdiction afforded to the Planning Board. The effect of those actions, although not inconsequential necessarily, is only procedural.

When the District Council reverses the Planning Board's determination regarding the approval of a CDP or SDP, however, the District Council risks interfering with the jurisdiction committed to the Planning Board. A Planning Board decision is vulnerable if it is not authorized by law, is not supported by substantial evidence of record, or is arbitrary or capricious. When the standard of administrative appellate review used by the District Council mimics the standard of review that would be employed by the courts for the review of the same agency action, it is not interfering with the jurisdiction of the Planning Board. Employing a less deferential standard of review, however, would impinge on the original jurisdiction granted to the Planning Board by the RDA.

87

Judicial review of administrative agency action based on factual findings, and the application of law to those factual findings, is "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is based on an erroneous conclusion of law." *United Parcel Serv., Inc. v. People's Counsel for Baltimore Cnty.*, 336 Md. 569, 577, 650 A.2d 226, 230 (1994). The reviewing court may not substitute its judgment for that of the administrative agency. *United Parcel Serv.*, 336 Md. at 576-77, 650 A.2d at 230. Rather, the court must affirm the agency decision if there is sufficient evidence such that "a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 160, 874 A.2d 919, 939 (2005) (quoting *Christopher v. Dept. of Health*, 381 Md. 188, 199, 849 A.2d 46, 52 (2004)) (internal quotation marks omitted).

Agency decisions receive an even more deferential review regarding matters that are committed to the agency's discretion and expertise. In such situations, courts may only reverse an agency decision if it is "arbitrary and capricious." *Spencer v. Maryland State Bd. of Pharmacy*, 380 Md. 515, 529-30, 846 A.2d 341, 349 (2004). "Logically, the courts owe a higher level of deference to functions specifically committed to the agency's discretion than they do to an agency's legal conclusions or factual findings." *Spencer*, 380 Md. at 529, 846 A.2d at 349.

The District Council, by applying properly these same standards to its review of Planning Board actions on CDPs and SDPs, would not encroach on the Planning Board's original and exclusive jurisdiction afforded by the RDA.[92]

Courts' limited review of the decisions of administrative agencies is grounded largely on Article 8 of the Declaration of Rights of the Constitution of Maryland, which mandates the separation of powers.[93] As a result, courts are "without authority to interfere with any (proper) exercise of the legislative prerogative or with the lawful exercise of administrative authority or discretion." *Dep't of Natural Res. v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 225, 334 A.2d 514, 524 (1975). Courts may not engage in an "independent original estimate of or decision on the evidence." *Linchester Sand & Gravel*, 274 Md. at 225, 334 A.2d at 523. Applied properly, reviewing the decision of an administrative agency under the standards described *supra*, a court does not encroach upon the powers of the Legislature as implemented by an administrative agency. *Linchester Sand & Gravel*, 274 Md. at 225, 334 A.2d at 523-24.

---

[92] Absent one of the specified events triggering District Council review, a Planning Board decision would be the final action regarding the approval of a CDP and/or SDP and thereby become reviewable only by the Circuit Court. *See Montgomery Pres., Inc. v. Montgomery Cnty. Planning Bd. of Maryland-Nat'l Capital Park & Planning Comm'n*, 424 Md. 367, 377, 36 A.3d 419, 424 (2012) ("We have recognized that in some contexts, a Planning Board's decision can be regarded as final."). If such were the case, an aggrieved party could turn to the Circuit Court to challenge the Planning Board's decision.

[93] Article 8 of the Declaration of Rights requires "[t]hat the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

Although separation of powers principles do not apply to the relationship between the District Council and the Planning Board, the same format seems appropriate to explain the treatment explained in this opinion. The courts and the Legislature derive their authority largely from the Constitution of Maryland, which divides the powers granted thereunder among them and the Executive Branch. The District Council and Planning Board derive their land use authority within the Regional District from the RDA, which divides the powers granted thereunder between them and other local agencies. As the courts are prohibited by the Declaration of Rights from usurping the legislative prerogative implemented through administrative agencies, the District Council is prohibited by the RDA from usurping the exclusive and original authority of the Planning Board. The Courts are not able to reach a different conclusion on the evidence when reviewing the decisions of an administrative agency. The District Council may not do so with regard to Planning Board decisions on CDPs and SDPs. If the standards of review applied by courts reviewing administrative agencies do not interfere with the substance of the Legislature's authority implemented by such administrative agencies, the District Council applying properly the same standards would not interfere with the substance of the Planning Board's authority.

The difference between the District Council's review of the Planning Board decisions here and the courts' review of administrative agency decisions is that the courts are granted explicitly the judicial power. Md. Const. Art. IV. The District Council is not given explicitly authority by the RDA to review decisions generally within the original jurisdiction of the Planning Board.

## VII. THE DISTRICT COUNCIL'S AUTHORITY TO CONSIDER IN ITS REVIEW ISSUES OTHER THAN THOSE REMANDED

The District Council argues that, during its ultimate review of and action in this case, it was not limited to considering only the issues remanded on 7 November 2011 to the Planning Board. According to the District Council, nothing in the RDA or the County Code limits the District Council to considering on election a Planning Board decision on remand only the remand issues. Further, the District Council claims that such a limitation would: (1) make the ability to remand nugatory; and, (2) requiring the District Council to make a final determination regarding any non-remand issues before it gathered all the information would be an absurd result. We disagree.

### A. Plain Language of PGCC § 27-523

The District Council is correct that the RDA does not limit explicitly the review of the District Council to issues the Council may remand to the Planning Board. As explained *supra* at Part VI, the RDA provides generally for the District Council to establish procedures, which would include remanding a CDP and SDP to the Planning Board.

In our view, the PGCC limits the District Council's review to the remand issues. PGCC § 27-523 governs review of CDPs and SDPs before the District Council.[94] The ordinance states:

---

[94] PGCC § 27-523 sets out the procedures applicable to District Council review of CDPs. PGCC § 27-528.01(c) states that, in regard to District Council review of SDPs, the District Council "shall render a final decision in accordance with [PGCC §] 27-523 within thirty (30) days after the close of the hearing."

> The District Council shall schedule a public hearing on the appeal or review. Testimony at the hearing shall be limited to the facts and information contained within the record made at the hearing before the Planning Board. In addition, the Council may take judicial notice of any evidence contained in the record of any earlier phase of the approval process relating to all or a portion of the same property, including the approval of a preliminary plat of subdivision.

PGCC § 27-523(c).

The Court of Special Appeals held that "the hearing before the Planning Board" indicated by PGCC § 27-523(c) included only the hearing on remand, at which the Planning Board's consideration was limited by the District Council to the issues remanded to the Board. *Zimmer Dev.*, 217 Md. App. at 330, 92 A.3d at 613. According to the appellate panel, the District Council's scope of review was constrained to the facts and information presented at the Planning Board's hearing immediately prior to the District Council's final review. *Id.* We agree with this construction.

The plain language of the second sentence of PGCC § 27-523(c) informs the conclusion. The word "before" may be used generally as a preposition, conjunction, or adverb, but in any context it indicates either that something occurred "in front of" or "during the period of time preceding" some other event or action. The only reasonable understanding of "before" in PGCC § 27-523(c) is as a preposition. The use of "before" indicates that the "hearing" to which the provision refers is the hearing that was "in front of" the Planning Board. This hearing is referred to using the definite article (i.e., "the"), indicating that this "hearing" is a particular one, and is identifiable. Where a remand occurs, there is necessarily more than one hearing, the initial one and one on remand. For

the "hearing" in question to be identifiable, it must be the ultimate or final Planning Board hearing and action which the District Council elected to review. If the District Council remanded previously the case to the Planning Board, "the facts and information contained within the record made at the hearing," to which the "testimony" at the District Council hearing is limited, would be related only to the remand issues.

The third sentence of PGCC § 27-523(c) indicates that, although the "testimony" at the District Council hearing is limited to addressing the evidence of the hearing immediately preceding, additional evidence may be considered. The District Council may take "judicial notice" of "any evidence" of record from "any earlier phase of the approval process" relating to the same property. PGCC § 27-523. This provision does not provide, however, the District Council with the authority to reconsider evidence from the pre-remand hearing before the Planning Board.

The Planning Board's decision to approve or deny an SDP or CDP prior to a remand by the District Council is not an "earlier phase of the approval process" for purposes of PGCC § 27-523(c). The definition of "phase" most apposite to the ordinance is "a distinguishable part in a course, development, or cycle."[95] *See Phase*, Merriam

---

[95] The other ways in which "phase" may be understood in particular contexts include: (1) "a particular appearance or state in a regularly recurring cycle of changes"; (2) "an aspect or part (as of a problem) under consideration"; (3) "the point or stage in a period of uniform circular motion, harmonic motion, or the periodic changes of any magnitude varying according to a simple harmonic law to which the rotation, oscillation, or variation has advanced from its standard position or assumed instant of starting"; (4) "a homogeneous, physically distinct, and mechanically separable portion of matter present in a nonhomogeneous physicochemical system"; and, (5) "an individual or

(Continued…)

Webster's Collegiate Dictionary (10th ed. 1993). The ordinance provides "the approval of a preliminary plat of subdivision" as an example of the "earlier phases" from which the District Council may take judicial notice of record evidence. The other "earlier phase[s]" would be the prior distinct steps for the approval of a development on the property, such as the record created during the zoning map amendment process. The Planning Board hearing occurring before a District Council remand for further consideration would be within the same "phase," and therefore, not accessible for consideration by the District Council after remand.

As we held *supra* at Part VI, the District Council's reversal of a Planning Board decision may be sustained by the courts, if at all, only when the Planning Board's decision is not supported by substantial evidence or is arbitrary, capricious, or illegal. The District Council's ability to "deny" CDP and SDP applications, such as it is, does not stem from its inherent authority to review *de novo* Planning Board decisions on the merits, but rather is cobbled together from the District Council's authority under the RDA to establish procedures and a corresponding appellate standard of review of courts. The District Council has the inherent authority to require that a CDP or SDP approval or dis-approval come before the District Council for the Council to perform a limited appellate review. It has authority to remand CDP and SDP applications to the Planning Board for

---

(…continued)
subgroup distinguishably different in appearance or behavior from the norm of the group to which it belongs[.]" *Phase,* Merriam Webster's Collegiate Dictionary (10th ed. 1993).

additional consideration. It has no inherent authority, however, to decide *de novo* CDP or SDP applications on the merits.

The ability to remand and shape the contours of reconsideration by the Planning Board is precisely the kind of authority that the RDA contemplated for the District Council. The RDA contemplates that the district councils will exercise legislative powers and administrative authority where granted. Establishing processes and directing the consideration of administrative agencies are legislative tasks. By remanding the approval or dis-approval of a CDP or an SDP to the Planning Board, the District Council alerts the Planning Board to considerations that it may have overlooked or evaluated incompletely or incorrectly earlier.

Even were we to conclude that the District Council has implicit inherent authority under the RDA to decide *de novo* the legal sufficiency of Planning Board decisions regarding SDPs and CDPs, it has limited itself through the plain language of PGCC § 27-523(c). The ordinance requires the District Council, upon deciding to remand a case to the Planning Board, to remand any concerns for which the District Council might later deny the application. This prevents the District Council from withholding from remand potential issues which could have been addressed satisfactorily on remand. It would border on arbitrariness and capriciousness for the District Council, if it believed in its initial review that the Planning Board may have been in error on multiple scores, to remand some, but not all, of the potential problematic issues, only later to reverse the

decision of the Planning Board for an "error" that was not remanded for consideration.[96] PGCC § 27-523(c) prevents that sort of action.

## B. Judicial Review of the District Council's Consideration of Non-Remand Issues

The District Council asks us to determine whether the Court of Special Appeals "nullified the District Council's statutory right to 'remand' a case to the Planning Board for further information, and the District Council's obligation to issue a 'final' decision prior to judicial review, by holding that the District Council is limited after remand to only those issues that were remanded." *Zimmer Dev.*, 440 Md. 114, 99 A.3d 778. The question is limited to an interpretation of PGCC § 27-523(c). We have rendered an interpretation of that County Code provision earlier. Enough said.

## VIII. THE CIRCUIT COURT'S REVERSAL OF THE DISTRICT COUNCIL'S DECISION.

The District Council argues that the Circuit Court erred by reversing the District Council's decision to deny CDP-1001 and SDP-1001 and ordering reinstatement of the Planning Boards decision(s). By the same token, the Court of Special Appeals erred in

_____

[96] We do not suggest that in the present case the District Council remanded only certain of the potential problems to the Planning Board arbitrarily, capriciously, or with the intent to "game" the process. The District Council has maintained consistently that it believed that it had original jurisdiction to approve or deny CDP-1001 and SDP-1001. If such were the case, remanding only certain issues to the Planning Board would likely be appropriate, even if there existed in the record other issues supporting denial. The District Council was mistaken, however, regarding its legal authority to review *de novo* the decision of the Planning Council.

Of course, if the District Council, on initial consideration and applying the appellate standards of review, believes that the Planning Board's action lacks substantial evidence to support the fact-findings, or is arbitrary, capricious, or otherwise illegal, it need not remand a case at all, but may deny the application and take its chances on subsequent judicial review, if sought by an aggrieved party.

affirming that action. According to the District Council, when an administrative agency applies the incorrect standard of review, the appropriate remedy is to remand the matter to the agency so that it may apply the correct standard.

That is the general rule. When an administrative function remains to be exercised at the end of the day, we hold generally that a court must remand the case to the administrative agency. *See, e.g., Maryland Bd. of Pub. Works v. K. Hovnanian's Four Seasons at Kent Island, LLC*, 425 Md. 482, 522, 42 A.3d 40, 63 (2012) ("The error committed by the Board was one of law—applying the wrong standard in formulating its decision. The appropriate remedy in such a situation is to vacate the decision and remand for further proceedings designed to correct the error."); *Bereano v. State Ethics Comm'n*, 403 Md. 716, 756, 944 A.2d 538, 561 (2008) ("As it is not properly our role to determine whether the agency's decision, absent this unavailable justification, otherwise would have been the same, reversal shall be the result and a remand for further proceedings before the Commission."). The court need not remand, however, if the remand would be futile. *O'Donnell v. Bassler*, 289 Md. 501, 510, 425 A.2d 1003, 1008 (1981); *see also Green v. Church of Jesus Christ of Latter-Day Saints*, 430 Md. 119, 143, 59 A.3d 1001, 1015 (2013) (ordering the case be remanded to the Tax Court, but directing the Tax Court's decision on remand); *Anne Arundel Cnty. v. Halle Dev., Inc.*, 408 Md. 539, 557, 971 A.2d 214, 225 (2009) ("The County's appeal to *Frankel* [*v. Bd. of Regents of Univ. of Maryland Sys.*, 361 Md. 298, 301, 761 A.2d 324, 325 (2000)] and general administrative law principles in arguing for a remand presumes, erroneously, that there is an administrative procedure and function that remains to be performed in this case.").

In the present case, both of the reviewing courts before us found that the Planning Board's decision was supported by substantial evidence. The District Council does not dispute that conclusion. For the reasons stated *supra*, because the District Council had no original jurisdiction to reverse the Planning Board's approval of CDP-1001 and SDP-1001, and such a reversal may only be affirmed by the courts if the Planning Board's decision was illegal, lacked substantial evidence, or was arbitrary or capricious, the District Council was required, applying the correct standard of review articulated by each court reviewing this case, to approve the decision of the Planning Board on this record. Therefore, there remains no administrative function to be performed. Remanding the case to the District Council would be futile because there was only one action the District Council could take.

## IX. CONCLUSIONS

### A. CDP and SDP Processes Going Forward

Our opinion, though voluminous, requires only a modest change in thinking by the District Council in the CDP and SDP processes in comprehensive design zones in Prince George's County. The submission and consideration of a CDP and SDP by the Planning Board is unchanged. The required contents of CDP and SDP submissions remains the same. To approve a CDP or SDP, the Planning Board must make the findings required for approval codified in PGCC § 27-521 (for a CDP) and in PGCC § 27-528 (for an SDP). The District Council, through conditional zoning, may guide the consideration of the Planning Board in these regards and require consideration of matters and resultant

98

findings necessary to protect surrounding properties or enhance coordinated, harmonious, and systematic development. LU § 22-214.

Our opinion recasts how the District Council must treat the authority of the Planning Board. The Planning Board has original jurisdiction to decide whether to approve or deny CDPs and SDPs. Pursuant to the division of the authority within the RDA, local matters that are related to planning, zoning, subdivision, or assignment of street names and house numbers are, unless otherwise specified, among the additional local functions over which the county planning boards have original jurisdiction. *See* LU § 20-202(a). Among the additional local functions over which the county planning boards have original jurisdiction are those delegated to them pursuant to LU § 20-207.

Once the Planning Board makes a decision regarding a CDP and SDP, such decision may be appealed to or called up by the District Council for appellate review.[97]

---

[97] Senate Bill 564 of 2015 was enacted, in part, "[for] the purpose of . . . providing that, in Prince George's County, a person may make a request to the district council for the review of a certain decision of a zoning hearing examiner or the planning board only under certain circumstances." 2015 Md. Laws ch. 365. The Bill added Section 25-212 to the Land Use article, which provides:

> In Prince George's County, a person may make a request to the district council for the review of a decision of the zoning hearing examiner or the planning board only if:
> (1) the person is an aggrieved person that appeared at the hearing before the zoning hearing examiner or planning board in person, by an attorney, or in writing; and
> (2) the review is expressly authorized under this division.

2015 Md. Laws ch. 365. The only other provision of the RDA providing expressly for review of a Planning Board decision by the District Council is LU § 25-210, which

(Continued…)

99

The District Council may remand the case for further consideration by the Planning Board, may affirm the Planning Board's decision, or may reverse the Planning Board's decision. If the District Council remands the Planning Board's approval or denial of the CDP or SDP and reviews it again subsequently, it may only reverse the Planning Board's decision on remand as to the issues that were remanded to the Planning Board for consideration or reconsideration. PGCC § 27-523(c).

The District Council may reverse an approval by the Planning Board only if the decision was one the Planning Board was not legally authorized to make, is not supported by substantial evidence of record, is arbitrary or capricious, or otherwise illegal. By reviewing the Planning Board's decision using the same standards that a court uses when reviewing an administrative agency action, the District Council will not interfere with the Planning Board's original jurisdiction over the CDP and SDP decision-making processes.

## B. Our Holdings

Although some amplification as to reasoning was thought desirable by us, we, the Court of Special Appeals, and the Circuit Court arrive at the same judgment in this case. We hold that: (1) the District Council possessed only appellate jurisdiction to review the Planning Board's decisions regarding CDP-1001 and SDP-1001, and was authorized to reverse the decision of the Planning Board only if the Board's decision was not supported by substantial evidence, was arbitrary, capricious, or illegal otherwise; (2) the District

(…continued)
authorizes District Council review of Detailed Site Plans. The act takes effect on 1 October 2015.

Council was not authorized, after electing to review on its own initiative the Planning Board's decisions regarding CDP-1001 and SDP-1001 for a second time, to consider issues other than those remanded to the Planning Board on 7 November 2011; and (3) the Circuit Court's order reversing the decision of the District Council denying CDP-1001 and SDP-1001 and ordering the District Council to affirm the decision of the Planning Board was appropriate. Therefore, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**